Dennis SULLIVAN, Michael Diskin, James Rosenweir, Hershel Heilig, Wayne Jackson, John Clark and John King, on their own behalf and on behalf of all others similarly situated Arc House, Inc. (Plf Intervenor)

v.

The CITY OF PITTSBURGH, PENNSYLVANIA Paul J. Imhoff, Supt. of Pittsburgh Bureau of Building Inspections, Robert H. Lurcott, Director of the Pittsburgh Dept. of City Planning Appellants,

v.

The COUNTY OF ALLEGHENY, PENNSYLVANIA and the Allegheny County Institution.

No. 85–3607.

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1986.

Decided Jan. 23, 1987.

As Amended March 5, 1987.

Rehearing and Rehearing En Banc Denied May 12, 1987.

D.R. Pellegrini (argued), City of Pittsburgh, Dept. of Law, Pittsburgh, Pa., for appellants.

John Stember, Donald Driscoll (argued), Catherine Martin, Daniel Haller, Pittsburgh, Pa., for D. Sullivan, M. Diskin, J. Roseweir, H. Heilig, W. Jackson, J. Clark, J. King.

Lee Markovitz, Anton W. Bigman, Pittsburgh, Pa., for Alcoholic Recovery Center, Inc.

Before ALDISERT, HIGGINBOTHAM and HUNTER, Circuit Judges.

## OPINION

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal arises from a class action brought by a group of recovering alcoholics to enjoin the closing of alcoholic treatment centers by the City of Pittsburgh, Pennsylvania. Alcoholic Recovery Center, Inc. ("ARC"), the non-profit corporation that manages and runs the treatment centers that treat class action plaintiffs-appellees, intervened in the action before the district court. The City now appeals the grant of the preliminary injunction enjoining it *pendente lite* from closing the treatment centers and requiring it to issue zoning and building permits and to distribute certain federal Community Development Block Grant ("CDBG") funds. Pursuant to 28 U.S.C. § 1292(a)(1), we have jurisdiction over the district court's interlocutory order granting preliminary injunctive relief. For the reasons set forth below, we will affirm the district court's order.

### I.

Since 1966, ARC has treated alcoholics in several facilities in the North Side section of Pittsburgh, Pennsylvania and elsewhere in Allegheny County. These facilities, located at 422–424 Tripoli Street, 1216 Middle Street and 800, 814, 816, 818 and 820 East Ohio Street in Pittsburgh and at 1831 Hulton Road, Verona and R.D. 1, Avella in Allegheny County, have served primarily low-income persons. In accordance with the then-existing Zoning Code of Pittsburgh,[1] ARC, on four occasions between 1966 and 1977, submitted applications for conditional use or occupancy permits required by the Code.[2] The Pittsburgh City

---

1. Since 1977, Pittsburgh has amended its Zoning Code, which regulates the use of real property within the City. *See infra* note 3. To the extent the City's actions under the pre–1977 Code belie a non-discriminatory purpose, it is factually relevant. Legally, however, the pre–1977 Code is of no consequence since the City took its challenged action under the Code as amended in later years.

2. At all relevant times, the Zoning Code has established a tri-partite process for the acquisition of a conditional use permit. First, the person or organization seeking the permit must submit an application to the City's Planning Department, which is responsible for processing such applications, as well as distributing CDBG funds. If the Planning Department tentatively concludes that the applicant meets applicable zoning and spacing requirements, it makes a non-binding recommendation of approval and sets a date for a hearing before the Planning Commission; individual Department staff members may also make non-binding funding suggestions as the applications are considered. Second, at the Commission hearing, of which affected community residents are apprised and to which they are invited, the applicant may present testimony or evidence which he believes is supportive and may respond to questions posed or concerns raised by community members. Affected parties may present testimony or evidence either in support of or in opposition to the application. After consideration of testimony and evidence, the Commission makes a non-binding recommendation of approval or disapproval which is forwarded to the City Council. Third, the Council holds a hearing at which the applicant and affected parties may present testimony or evidence and at which the applicant may address questions or concerns raised by community members or the Council. After the hearing, the vote of a simple majority of the

Council never acted upon these Planning Department applications, although the Pittsburgh Planning Commission did recommend approval of the 1977 application. Despite its failure to act upon ARC's permit applications, the City sent a letter of commendation to ARC on March 23, 1977.

On September 15, 1980, Pittsburgh amended its Zoning Code with respect to facilities such as those operated by ARC.[3] Thereafter, in 1982, ARC applied for conditional use permits for group care facilities at 1216 Middle Street and 422–424 Tripoli Street and for an institutional facility at 800, 814, 816 and 818 East Ohio Street, seeking approval for a total of 99 residents. The Pittsburgh Planning Department recommended approval for only 1216 Middle Street and 800 East Ohio Street for a total occupancy of 65 residents. One senior planner for the Planning Department also recommended that the City of Pittsburgh allocate $75,000 to $100,000 of CDBG funds for necessary renovations of ARC facilities.

On September 14, 1982, at a public hearing held by the Planning Department, the East North Side Area Council, a community organization, expressed hostility towards ARC and reluctance about accepting a treatment center for alcoholics in its neighborhood. Later, in early May, 1983, ARC responded to potential overcrowding in the Allegheny County Jail by announcing it would accept persons convicted of driving while under the influence of alcohol for treatment in its North Side Facilities, apparently raising some concern in the surrounding community. On July 12, 1983, City Councilman William Robinson, on behalf of the East North Side Area Council, demanded that Pittsburgh close all ARC facilities. Soon thereafter, on July 18, 1983, Councilman Robinson, along with two other council members, introduced a resolution stating that the Council intended to impose a moratorium on the establishment of group homes in Pittsburgh, funded from whatever source, until such time as a procedure acceptable to both the City and the County for locating such homes was established. The resolution was adopted by the City Council on that same date.

Apparently in partial response to the Council, the Planning Department, on October 25, 1983, recommended in an internal

---

Council determines whether or not the application is approved. App. at 415a–417a; 476a. Determinations at every stage of the process are to be made in accordance with the Zoning Code.

3. The Code, as amended in 1980, establishes three classes of group homes, which by definition provide specialized health, social, and rehabilitative services and which, in accordance with the amended Code, must acquire conditional use permits to operate. "Group residence facilities" serve seven residents and house a total of nine persons; "group care facilities" serve seventeen residents and house a total of nineteen persons; "institutional facilities" serve and house more than nineteen persons. Issuance of a conditional use permit is conditioned upon fulfillment of certain requirements set forth in § 993.01. The grounds for denial of a conditional use permit are too numerous to set forth in full here; ARC's conditional use application was purportedly denied on the basis of three sections. The first, § 993.01(a)D, provides:

No conditional use shall be recommended for approval if any of the following findings is made:
(1) That the establishment, maintenance, location and operation of the proposed use will be detrimental to or endanger the public health, safety, morals, comfort or general welfare; and
(2) That the proposed use will be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes permitted, nor substantially diminish or impair property values within the neighborhood; and
(3) That the establishment of the proposed use will impede the normal and orderly development and improvement of surrounding property for uses permitted in that district; and
(4) That adequate utilities, access roads, drainage and other necessary facilities have not been or will not be provided; and
(5) That adequate measures have not been or will not be taken to provide ingress and egress designated so as to minimize traffic congestion in the public streets; and
(6) That the proposed use will not, in all other respects, conform to the applicable regulations or the district in which it is located.
The second and third sections, §§ 993.01(a)A10 and 993.01(a)A44 together provide that institutional or group care facilities will be denied conditional use permits if they fail to meet lot size requirements of their zoning districts. App. at 1124a–1126a.

.

memo that conditional use permit applications for the 1216 Middle Street facility be approved, and that $200,000 in CDBG funds be used to relocate the residents of other ARC facilities outside Pittsburgh. On the same day, the Planning Department officially recommended approval of the Middle Street facility, but denied approval for the Tripoli and East Ohio Street locations. Later, Frederick Just, a senior planner for the Planning Department, indicated to Charles Cain, director of ARC, that community opposition had been a determinative factor in the Department's decision. On November 21, 1983, in keeping with its moratorium, the City Council, without providing a hearing or offering written reasons, rejected conditional use applications for the Middle Street, Tripoli Street, and East Ohio Street facilities.

After the Council's rejection of its applications, ARC worked with the Planning Department in an attempt to find alternate sites for its Pittsburgh facilities. Because the Planning Department concluded that community opposition had to be considered in selecting alternate sites, the Department rejected several proposals for relocation due to anticipated neighborhood hostility.

As a result of these developments, City and County officials and representatives of ARC met in the fall of 1984 to find a way to allay community fears and to allow ARC to remain in the North Side section. An agreement was reached which was to become effective, at the City's insistence, only with the consent of local community organizations. The agreement provided that (1) ARC would operate only its 800 East Ohio Street facility in the Northside section; (2) ARC would treat only 50 alcoholics in the facility; (3) the City would provide $100,000 and the County would provide $100,000 in the form of CDBG funds for renovations and improvements to the East Ohio Street facility, subject to formal approval by the City Council and County Commissioners; (4) the City Council would appoint one-third of the board members of ARC, and ARC in turn would remove all staff members from its Board while appointing community residents to it; (5) the

City and County would monitor ARC's performance and ARC would regularly meet with neighborhood groups; (6) the County would seek funding so that it could hire a new administrative officer; (7) ARC would treat no persons convicted of driving while under the influence of alcohol at the East Ohio Street facility; and (8) the County would invest an additional $100,000 in CDBG funds to acquire or improve ARC facilities located in Allegheny County. City and County officials reached the agreement after having been given informal authority by their respective administrations to resolve the conflict. The agreement is significant because earlier, in January, 1984, the City had filed suit against ARC in the Allegheny County Court of Common Pleas seeking preliminary and permanent injunctions to close all ARC facilities in Pittsburgh. The action was based on ARC's failure to meet fire and building codes, which ARC maintained could only be corrected with the appropriate zoning approval from the City. After an issuance and vacation of the injunctions, a consent agreement was entered on January 14, 1985, which essentially incorporated the terms of the agreement between ARC and City and County officials. Subsequently, in accordance with the agreement, ARC sought to attain the required zoning approval for the East Ohio Street Center. ARC was unable, however, to obtain the required consent of the East North Side Area Council. Another community organization, the East Allegheny Community Council, later agreed to the proposal, but only upon certain conditions, one being that ARC sell its other properties only when the organization agreed that it could.

Despite its inability to gain the unanimous support of community organizations, ARC continued to seek zoning approval. On February 5, 1985, the Planning Department recommended that ARC's application for the East Ohio Street facility be approved for 55 residents. The Department also recommended that (1) an outside full-time director be hired by the ARC Board within 60 days of approval by the Council;

(2) three neighborhood residents be appointed to the ARC Board within 30 days of Council's approval; (3) funds for remedying Code violations be secured within 90 days of Council's approval; and (4) a site plan to include a privacy fence, landscaping, and a recreation area be submitted to the Planning Department within 30 days of Council's approval. On April 22, 1985, presumably after a Planning Commission hearing, City Council held a five-hour public hearing on the ARC application. Apparently still bound by its moratorium, the Council voted on May 20, 1985 to deny ARC's application on grounds that approval would diminish surrounding property values and hinder orderly community development.

Shortly thereafter, the instant action was filed in the United States District Court for the Western District of Pennsylvania against the City by a class consisting of alcoholics in need of ARC services who could obtain those services nowhere else. ARC's subsequent motion to intervene was granted by the district court on grounds that ARC, as operator of the recovery centers, had an interest in the property and transactions which might be affected by class action plaintiffs' suit. After trial, pursuant to the Equal Protection Clause, 42 U.S.C. § 1983, and 29 U.S.C. § 794, the district court, 620 F.Supp. 935, granted preliminary injunctive relief *pendente lite* which directed (1) the City to grant ARC a conditional use permit for a group care facility at 1216 Middle Street, and a conditional use permit for an institutional facility at 800 East Ohio Street; (2) the City to grant ARC building permits to undertake repairs and renovations at 1216 Middle Street and 800 East Ohio Street to bring those facilities into compliance with relevant codes; (3) the City to grant occupancy permits for these locations without undue delay; (4) the City and County to pay to ARC the sum of $100,000 in CDBG funds for necessary repairs and renovations of both the 1216 Middle Street and 800 East Ohio Street facilities within 90 days; and (5) the City and County to appropriate additional CDBG funds after initial repairs to

finance certain exterior renovations of the 800 East Ohio Street facility so that ARC might provide services to 50 residents at that facility. The City now appeals the district court's grant of injunctive relief. The County does not appeal.

## II.

This case requires us to make several inquiries. First, we must determine whether plaintiffs in the action before the district court had standing to bring suit. Second, we must determine whether the district court abused its discretion in failing to abstain from deciding the action before it. Third, we must determine whether this action was barred by the statute of limitations. Fourth, we must determine whether the granting of the injunction under the circumstances of this case violated federal statutory law. And finally, we must determine whether the district court correctly concluded that appellees were entitled to an injunction on the basis of their federal constitutional and statutory claims. We will resolve these issues in the order set forth above.

## III.

■ We first consider the standing of class action plaintiffs in the action before the district court. On appeal, appellants assert for the first time that class action plaintiffs-appellees should be denied injunctive relief because appellees were not directly affected by the City's actions in denying ARC zoning approval. As indirectly affected parties without a property interest in the property denied zoning approval, appellants contend, class-action plaintiffs-appellees lack standing to challenge the City's actions. We are unpersuaded by appellants' argument.

The leading case on the issue of standing is *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Warth,* a non-profit corporation desiring to alleviate the housing shortage for low-and-moderate income persons, along with several racial and ethnic minorities, brought suit against

a municipality alleging that its zoning ordinance effectively excluded low- and moderate-income persons from living in the town in contravention of, *inter alia*, the fourteenth amendment and 42 U.S.C. § 1983. In ruling on plaintiffs' claims, the Supreme Court set forth the bifurcated inquiry which must be undertaken by a federal court resolving a standing question. First, a federal court must determine whether a plaintiff has "suffered 'some threatened or actual injury resulting from the putatively illegal action,' " *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)), by the defendant. Second, if the federal court determines that the plaintiff has suffered such injury, the court must then determine whether non-constitutional, prudential limitations dictate that the court not exercise jurisdiction. Prudential limitations would so dictate where a plaintiff merely alleges a generalized grievance shared by a large class of citizens or where a plaintiff asserts the rights or interests of a third party. *Id.*

Here, class action plaintiffs-appellees' claims satisfy both *Warth* requirements. Since appellees contend in their pleadings that they will not receive treatment if an ARC facility is not kept open, *see* App. at 7a–10a, they have "allege[d] specific, concrete facts demonstrating that the challenged practices harm [them] and that [they] personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210. Additionally, because class action plaintiffs-appellees are the intended recipients of ARC's services, they, like plaintiffs in federal cases the *Warth* Court cited approvingly, have "challenged zoning restrictions as applied to particular projects that would supply housing within their means, and *of which they* [are] *intended residents.*" [4] *Id.* at 507, 95 S.Ct. 2209 (emphasis added). Moreover, prudential limita-

tions are inapplicable to class action plaintiffs-appellees' claims since appellees allege harm to themselves from lack of treatment as opposed to a generalized harm to a society from lack of treatment centers for alcoholics. And clearly, class action plaintiffs-appellees assert their own rights (both under the Equal Protection Clause and under the Rehabilitation Act of 1973) rather than the rights of a third party. We therefore hold that appellees had standing to bring this suit before the district court.

## IV.

■ We next consider the district court's decision not to abstain from passing on class action plaintiffs-appellees' claims. Appellants contend that *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny required abstention in this case. Appellants base their contention primarily on *Ohio Civil Rights Commission v. Dayton Christian Schools,* — U.S. ——, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In *Dayton Christian Schools,* a private, non-profit religious educational institution (Dayton Christian Schools, Inc.) required its teachers to subscribe to a particular set of religious beliefs, including belief in the internal resolution of disputes. As a condition of employment, teachers were required to present any employment-related grievance to their immediate supervisors and to acquiesce in the final decision of Dayton's board of directors rather than to pursue a civil remedy in court. After a pregnant teacher was told her employment contract would not be renewed due to the school's religious doctrine that mothers should stay home with their preschool children, she contacted an attorney, who threatened Dayton with state and federal litigation. Dayton then rescinded its nonrenewal decision, but terminated the teacher for violation of the internal dispute resolution agreement. The teacher then filed an action with the Ohio Civil Rights Com-

---

**4.** *See e.g., Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208 (8th Cir.1972) (individual plaintiffs who would be able to reside in proposed subsidized housing have standing to challenge zoning practices preventing its con-

struction): *Dailey v. City of Lawton,* 425 F.2d 1037 (10th Cir.1970) (potential tenant may maintain action challenging zoning decisions affecting proposed housing project).

mission, alleging that her termination violated Ohio sex discrimination statutes. Ultimately, the Commission initiated internal administrative proceedings against Dayton, which answered the complaint by asserting that the Commission's exercise of jurisdiction over the matter would violate the first amendment. While the administrative proceedings were pending, Dayton and others filed a federal action seeking an injunction against the state administrative proceedings.

After rulings by federal district and circuit courts, the Supreme Court held that the district court should have abstained. The Court held that *Younger* concerns are applicable to state administrative proceedings as well as state criminal proceedings and that so long as a state plaintiff has a full and fair opportunity to litigate his federal claims at some point in the state proceedings, abstention is appropriate. *Dayton*, 106 S.Ct. at 2722–24. Accordingly, since Dayton could raise its constitutional claims before a state court reviewing the Commission's findings, as well as possibly before the Commission itself, the Court held that the district court should have abstained. *Id.*

Appellants maintain that *Dayton Christian Schools* requires abstention in this case. Here, as in *Dayton Christian Schools*, a state administrative hearing is implicated. As in *Dayton Christian Schools*, it appears that the state plaintiff (ARC) may ultimately present its constitutional claims in the state administrative proceedings.[5] Several facts, however, distinguish this case from typical cases in which abstention is appropriate, and these facts make *Dayton Christian Schools* and *Younger* inapplicable.

First, the federal plaintiffs in this suit (a class consisting of recovering alcoholics who seek and have received treatment at ARC) are not the defendants in, nor even parties to, the relevant state administrative proceeding. ARC alone brought the state action when it sought a conditional use permit and then appealed. As the Supreme

Court made clear in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), where the plaintiff in a federal action is not a party to the state proceeding, *Younger* concerns about federal adjudication do not arise. In *Doran*, three corporations, each of which operated a bar in a town with an ordinance prohibiting topless dancing, brought an action in federal court challenging the ordinance. One of the three corporations also violated the ordinance during the pendency of the action and was charged in a criminal proceeding. On review, the Supreme Court allowed relief for the two uncharged federal plaintiffs on grounds that because there were no state proceedings pending against them, *Younger* concerns about questions of federalism, comity, or state competence to adjudicate federal claims were not implicated. *Doran*, 422 U.S. at 930, 95 S.Ct. at 2567. Here, as in *Doran*, the federal plaintiff is not a party to an ongoing state proceeding. Since adjudication of the merits of class action plaintiffs-appellees' federal claims in this case creates no presumption of state adjudicative inadequacy with respect to ARC's zoning hearing and appeal, *Younger* and *Dayton Christian Schools* are simply inapplicable.

It may be contended that the federal plaintiffs and state plaintiff in this suit, though legally distinct, are so closely related that a federal action by one should not be permitted while the other seeks redress of the operative wrong in a state proceeding. In fact, the Supreme Court in *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), held that parties who are too closely related should be treated as one party for *Younger* purposes. Upon analysis, however, the contention that *Hicks* controls in this case must be rejected. Federal class action plaintiffs-appellees and state plaintiff ARC are not sufficiently related to justify unitary treatment. This Court in *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.*, 654 F.2d 868 (3d Cir.1981), held that

---

5. Brief of Class Action Plaintiffs-Appellees at 26.

unitary treatment under *Younger* is limited to "an employer's federal suit when its employees assert identical interests in state court", *id.* at 878, and to cases in which federal plaintiffs are closely related to "state defendants 'in terms of ownership, control and management.'" *Id.* (quoting *Doran v. Salem Inn*, 422 U.S. at 929, 95 S.Ct. at 2566.) This Court specifically interpreted *Doran* as requiring unitary treatment under *Younger* only where there exists "an identity of economic activities and interests." *Id.* Class action plaintiffs-appellees and ARC plainly lack the requisite identity of activities and interests. Class action plaintiffs-appellees have no proprietary interest in ARC, and ARC does not employ appellees. *Cf. Hicks*, 422 U.S. at 348, 95 S.Ct. at 2291 (federal plaintiff employed state defendant and federal plaintiff's federal claim was intertwined with state defendant's right).

Moreover, the conclusion that class action plaintiffs-appellees have interests which are distinct for purposes of *Younger* from those of intervenor ARC is supported by *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Roe*, two prosecutions under the Texas abortion law challenged by class action plaintiff-appellant were pending against Dr. James Hallford, who had intervened in the district court action. Hallford argued to the Supreme Court that he was entitled to intervene in the class action under *Younger* as "a 'potential future defendant'", *id.* at 126, 93 S.Ct. at 713, despite the pending state prosecutions. After consideration, the Court rejected Hallford's argument and cited *Younger*. *Id.* at 126–27, 93 S.Ct. at 713–14. The Court, then, however, proceeded to adjudicate the class action plaintiff-appellant's claim *on the merits*, despite the fact that the grant of declaratory or injunctive relief to class action plaintiffs-appellants would have, as a practical matter, ended the state prosecution against Hallford under the very same statute. In so doing, the Court recognized that in the treatment context, *Younger* identity is not easily inferred and that patients and those who treat them have distinct interests [6] in state action which affects the possibility of treatment.[7] *See* Fiss, *Dombrowski*, 86 Yale L.J. 1103, 1130–31 (1977).

**6.** *See also Family Division Trial Lawyers v. Moultrie*, 725 F.2d 695 (D.C.Cir.1984) (abstention inappropriate where federal plaintiff not party to any pending state suit and state suit questionable vehicle for pressing federal claims). *Women's Community Health Center of Beaumont v. Texas Health Facilities Comm'n*, 685 F.2d 974 (5th Cir.1982), is not to the contrary. That case upheld a district court's abstention where physicians and patients of a particular health center sought an injunction against Texas's enforcement of certain provisions of its Health Planning Act. Abstention was there arguably warranted because the state's actions with respect to only one center at one time were challenged, and the entire controversy could be adjudicated in state court. *Id.* at 982. In this case, abstention is not warranted, in part because state action over a period of time affecting more than one treatment unit may be challenged in the federal proceeding but not in the state proceeding. *See infra* p. 179. Further, to the extent that *Women's Community Health Center* is inconsistent with *Roe v. Wade*, the former is invalid.

**7.** It cannot be contended that because federal class action plaintiffs-appellees could have permissibly intervened in the state proceeding involving federal intervenor ARC, federal plaintiffs-appellees possess interests which are sufficiently analogous to federal intervenor's to justify abstention. Although it appears that plaintiffs-appellees could have intervened in the state proceeding, *see* 53 Pa.Stat.Ann. § 11009 (Purdon 1974), *Younger* has yet to be interpreted by the Supreme Court to require both abstention by a federal court and intervention by a potential private state litigant. *New Jersey-Philadelphia Presbytery Church v. New Jersey State Bd. of Higher Educ.*, 654 F.2d at 882. Further, a rule that permits a conclusion of identity of interest for *Younger* purposes from the mere possibility of permissive intervention in state proceedings allows a state litigant to dictate choice of forum for all potential intervenors based solely on a limited common interest, without regard to identity, economic control, preferred litigation strategy and ultimate litigation goals. More fundamentally, a rule that considers the possibility of permissive state intervention dispositive of identity for *Younger* purposes ignores the most significant issue that a federal court asked to abstain must address, namely, whether "the party to the federal case may fully litigate his claim before the state court." *Hicks*, 422 U.S. at 349, 95 S.Ct. at 2292.

The Court's actions in *Roe* might indicate that the district court should have denied ARC's motion to intervene in the federal proceeding. Because the district court granted available injunc-

Abstention in this case would also have been improper because federal plaintiffs would have been unable to request in the state proceeding all relief available in federal court. Under Pennsylvania law, the sole state method for contesting the validity or constitutionality of a zoning ordinance or the application thereof is the filing of an appeal with the board of adjustment (with possible subsequent judicial review) or directly with the court of common pleas, if appropriate. *Appeal of Bradley,* 58 Delaware County Ct. 119 (1970). To be effective, the appeal must be filed within 30 days of the relevant administrative action. 42 Pa.Cons.Stat.Ann. § 5571 (Purdon 1981). Here, federal relief was available for the City's alleged November 21, 1983 violation of the Equal Protection and Due Process Clauses.[8] The City's November 21, 1983 actions could not, however, have been attacked in any state zoning proceeding since, by the filing of the federal complaint, the state statute of limitations had lapsed. In light of class action plaintiffs-appellees' inability to litigate this claim, we cannot conclude that the state proceeding could have afforded complete relief.[9]

*Younger* and *Dayton Christian Schools* are inapplicable for a third reason. Since *Younger,* the Court has recognized that extraordinary circumstances may threaten irreparable injury which justifies federal intervention in ongoing state proceedings even in the absence of bad faith or harassment by state officials. *Younger,* 401 U.S.

at 53, 91 S.Ct. at 755. Although the Court has acknowledged that the nature of the term "irreparable harm" makes it difficult to define every situation the term encompasses, *see Trainor v. Hernandez,* 431 U.S. 434, 442 n. 7, 97 S.Ct. 1911, 1917 n. 7, 52 L.Ed.2d 486 (1977), the Court has stated that circumstances are extraordinary in the relevant *Younger* sense where they create "an extraordinarily pressing need for immediate federal equitable relief," *Kugler v. Helfant,* 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975), and do not simply present a unique or unusual factual situation. *Id.* at 125, 95 S.Ct. at 1531. Such need for relief appears justified upon a showing " 'that an injunction is necessary in order to afford adequate protection of constitutional rights.' " *Wooley v. Maynard,* 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977) (quoting *Spielman Motor Co. v. Dodge,* 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935)).

Here, appellees have made such a showing. As the evidence indicated, and the district court reasonably found, class action plaintiffs-appellees are primarily recovering alcoholics who are in a critical state of their recovery. Finding of Fact ("FF") 82. Without proper care, supervision and peer support each could easily suffer a relapse. *Id.* For these alcoholics, a relapse threatens not only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death. The record reflected that alcoholics who had been de-

---

tive relief on class action plaintiffs-appellees' claims, and thus ARC's intervention had no practical consequence, we do not consider the propriety of the district court's action in allowing ARC to intervene.

**8.** As is noted infra pp. 179–80, the relevant statute of limitations on the federal claims is two years.

**9.** Since appeal of the City's November 21, 1983 decision was absolutely barred at the filing of the federal class action plaintiffs' suit, we need not consider whether it would be procedurally possible for the Allegheny County Court of Common Pleas to consider both the November 21, 1983 decision and the May 20, 1985 decision in the same zoning appeal. Temporal considerations aside, we find it sufficient to note that

separate zoning appeals may be properly consolidated only where the causes of action involved in each appeal are so related that the determination of one cause is a virtual determination of the other. 1 Goodrich-Amram 2d § 213(a):1 at 164–65 n. 98 (1976); *Mosside Assoc. Ltd. v. Zoning Hearing Bd. of the Municipality of Monroeville,* 70 Pa.Commw. 555, 558–59, 454 A.2d 199, 201 (1982). Here, the distinct factual predicates underlying the November 21, 1983 and May 20, 1985 decisions would appear to preclude the possibility that one adjudication would determine the other. For the reasons set forth above, we also do not consider whether class action plaintiffs-appellees could raise their Rehabilitation Act of 1973 claim in a state zoning proceeding which, even in its appellate stages, appears limited to zoning decisions affecting zoned property.

nied treatment at the Center were unable to end their alcohol abuse and suffered severe injury or death as a result, App. at 287a, and it is clear that ARC provides the only treatment available for appellees. FF 80, 82. It was therefore not a clear error for the district court to conclude that if recovering alcoholics at the Center were improperly forced from the center and into a community which cannot provide treatment for their abuse, these alcoholics too might suffer as earlier untreated alcoholics in the North Side section have. We believe that the threat of this type of injury is precisely what the irreparable harm exception to *Younger* is intended to prevent. Indeed, it is difficult to conceive of many facts which would more compellingly argue for appellees' relief. A wrongful deprivation by the City of Pittsburgh in this case would threaten not only to do harm to appellees' present enjoyment of rights to Equal Protection, Due Process and equal treatment under the Rehabilitation Act of 1973, but to eliminate the possibility of appellees' enjoyment or exercise of any federal constitutional or statutory rights in the future. In light of this, we cannot conclude that the district court should have abstained to accommodate attenuated comity and federalism interests.

## V.

■ We next consider appellants' statute of limitations defense. In *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court held that the statute of limitations for purposes of § 1983 civil rights actions is the statute of limitations for the relevant state's personal injury statute.[10] The appropriate limitation period for § 1983 claims brought in Pennsylvania is the two-year limitation period provided by 42 Pa.Cons.Stat.Ann. § 5524. *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir.1985).[11] Since class action plaintiffs-appellees filed their complaint May 22, 1985, their action was clearly timely as to both City Council's November 21, 1983 and May 20, 1985 zoning application rejections. We therefore hold that the appropriate statute of limitations poses no bar to the claims in this suit.

## VI.

■ We next consider appellants' federal statutory claims. Appellants assert that the district court violated the Full Faith and Credit Act, 28 U.S.C. § 1738 (1982), by issuing an injunction which was inconsistent with a January 14, 1985 consent decree of the Allegheny County Court of Common Pleas. That consent decree, entered into between ARC and the City, ordered ARC (1) to cease occupancy of any of its facilities in Pittsburgh other than the 800 East Ohio Street facility within 90 days of January 14; (2) ARC to cease occupancy of its 800 East Ohio Street facility within 90 days of January 14 if ARC had not acquired necessary use and occupancy permits and to resume occupancy only upon acquisition of those permits, and (3) to cease admission of persons into its Pittsburgh facilities and programs. Appellants contend that since the district court's decision in the instant litigation permits ARC to continue to occupy its 800 East Ohio Street facility without

10. Although the district court in the underlying action did not award damages, relief was granted pursuant to 42 U.S.C. § 1983, which authorizes federal courts to afford injunctive as well as retroactive relief. *See Taylor v. City of Knoxville*, 566 F.Supp. 925 (E.D.Tenn.1982). Accordingly, *Wilson* is applicable to appellant's statute of limitations defense.

11. We must reject appellant's assertion that the proper statute of limitations in this case is the 30–day period provided for appeals of administrative decisions by 42 Pa.Cons.Stat.Ann. § 5571 (Purdon 1981). Such an assertion flies in the face both of *Wilson* and *Smith*, neither of which suggests that a zoning decision should be afforded special statute of limitations protection. Indeed, the creation of such an exception would diminish the uniformity of statute of limitations periods that *Wilson* sought to achieve. *See Wilson*, 105 S.Ct. at 1944. Adoption of appellants' suggestion would also have the undesirable effect of forcing adversely affected parties to zoning proceedings to file federal suit within 30 days of an initial zoning decision, thus virtually eliminating cases in which successful zoning appeals obviated the need for any federal litigation.

proper permits and to occupy its 1216 Middle Street facility at all, the district court failed to accord the judgment of the Court of Common Pleas full faith and credit.

Section 1738 requires federal courts to give a state court judgment preclusive effect to the same extent the courts of the rendering state would. *Davis v. United States Steel Supply,* 688 F.2d 166, 170 (3d Cir.1982), *cert. denied,* 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983). To fulfill their § 1738 obligation, federal courts must look to relevant state (here Pennsylvania) res judicata and estoppel law in determining the effect of state court judgments. *Id.* In Pennsylvania, a consent decree is a judgment only as to matters actually litigated and cannot preclude claims which were not raised before and resolved by the approving court. *See Keystone Building Corp. v. Lincoln Savings and Loan,* 468 Pa. 85, 360 A.2d 191 (1976); *In Re: Jones & Laughlin,* 328 Pa.Super. 442, 477 A.2d 527 (1984). Further, under Pennsylvania law, a consent decree is an agreement only between parties and does not bind or preclude the claims of non-parties. *Sabatine v. Commonwealth,* 497 Pa. 453, 442 A.2d 210 (1981). Pennsylvania law thus makes clear that the district court did not fail to accord full faith and credit to the Allegheny County Court judgment in issuing its own injunction. First, the constitutional and federal statutory claims on which the district court based the injunction were not raised before the Common Pleas court that approved the consent decree. Indeed, ARC was not permitted by state law to raise those claims in that proceeding. Conclusion of Law ("CL") 31. ARC was therefore not afforded the full and fair opportunity to litigate those claims, which is a prerequisite for preclusive effect under Pennsylvania law. *Safeguard Mut. Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664 (1975). Second, although ARC was a party to the consent decree, class action plaintiffs in the suit before the district court were not. Thus, whatever effect the consent decree might have upon claims of ARC, the decree cannot preclude claims made by those actually receiving treatment in the Center.

Since the district court's injunction related to claims of parties not considered by the Allegheny Court of Common Pleas in its consent decree, we find the injunction consistent with § 1738.

## VII.

Finally, we turn to the question of the propriety of the district court's grant of preliminary injunctive relief. To grant a preliminary injunction, a trial court must conclude that:

(1) plaintiffs are likely to succeed on the merits;

(2) plaintiffs are subject to irreparable harm *pendente lite;*

(3) defendants will not suffer substantial harm from the grant of an injunction; and

(4) the public interest requires that plaintiffs be accorded relief.

*Constructors Ass'n. of Western Pa. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978). Once a preliminary injunction has been granted, an appellate court may rescind the grant only where it is shown that "the trial court abuse[d its] discretion, commit[ted] an obvious error in applying the law, or ma[de] a serious mistake in considering the proof." *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir.1976). We must therefore review the district court's grant of injunctive relief on both class action plaintiffs-appellees' statutory and constitutional claims, considering each element of each claim under these standards.

### A. Section 504 of the Rehabilitation Act of 1973

i. Likelihood of Success on The Merits

█ The district court concluded that class action plaintiffs-appellees were likely to succeed on their claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In order to prevail properly on that claim, appellees were required to make a *prima facie* case by demonstrating that

(1) they were handicapped individuals under the Act;

(2) they were otherwise qualified for the program of benefits from which they had been excluded;

(3) they have been excluded solely because of these handicaps; and

(4) the program from which they have been excluded is subject to § 504.

*Strathie v. Dept. of Transp.*, 716 F.2d 227, 230 (3d Cir.1983). If defendants then failed to show that their actions were substantially justified—not merely reasonable—appellees were entitled to judgment. *Id.* at 233.

We cannot conclude that the district court erred in finding that class action plaintiffs-appellees are likely to prevail on the first prong of the *Strathie* test. As the record shows, appellees demonstrated that they suffered from varying degrees of alcoholism. FF 77. Case law establishes that alcoholics are handicapped within the meaning of § 504. *Davis v. Bucher*, 451 F.Supp. 791, 797 n. 4 (E.D.Pa.1978); *see McKelvey v. Walters*, 596 F.Supp. 1317, 1323 (D.D.C.1984).[12] We also cannot conclude that the district court erred in finding that class action plaintiffs-appellees are likely to prevail on the second prong of the *Strathie* test. For purposes of § 504, an "otherwise qualified handicapped individual" is a handicapped person who is able to meet all requirements for receipt of benefits of a federally-funded program or activity despite his or her handicap. *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Traynor v. Walters*, 606 F.Supp. 391, 400 (S.D.N.Y.1985). It is undisputed that appellees are and were eligible to receive funds from the federal CDBG program at issue despite any handicap. Indeed, the City implicitly recognized

their eligibility when it offered in 1985 to provide $100,000 in CDBG funds for renovation of 800 East Ohio Street and when the City's Planning Department recommended in 1982 that $75,000 to $100,000 in CDBG funds be provided for renovation of certain of ARC's properties.

The district court also did not err when it concluded that class action plaintiffs-appellees are likely to prevail on the third prong of the *Strathie* test, which requires that Pittsburgh have denied funding based on the relevant handicap. The record more than adequately supports a conclusion that the City was motivated by the handicapped status of class action plaintiffs-appellees when it denied the relevant conditional use permit applications. As the evidence showed, the Planning Department rejected proposed relocations by ARC (which would have resulted in funding) based only on community hostility towards alcoholics. FF 37. In fact, the Department did so after actually recommending federal funding of ARC before community opposition to alcoholic treatment centers began to mount. Further, the City acknowledged through the Planning Department that the level of community opposition to the alcoholism of ARC's residents was a factor the City considered determinative in its decision concerning site selection for ARC. *Id.* Finally, Pittsburgh denied zoning approval for ARC after the East North Side Council refused to give its approval to the zoning, and the City later offered reasons for its actions that were unsupported by fact. CL 8–12. In light of the fact that appellees were otherwise eligible for the funding they were denied, and particularly in light

---

**12.** We must reject the City's assertion that it did not violate § 504 because it denied CDBG funds to intervenor ARC which is not a "qualified handicapped individual" under the Act. *See* Brief of Appellant at 24. Section 504's protection extends not just to handicapped individuals who are direct participants in federally-funded programs or activities but also to those who are intended ultimate beneficiaries of such programs or activities. Under § 504, discrimination on the basis of handicap is actionable upon a simple showing that discrimination has resulted in "a diminution of the benefits [a handi-

capped individual] would otherwise receive from [a federally-funded] program." *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1232 (7th Cir.1980). In fact, the clear intent of Congress in enacting § 504 was to make unlawful direct or indirect discrimination against any handicapped individual who would benefit from a federally-funded program or activity. *NAACP v. Wilmington Medical Center, Inc.*, 453 F.Supp. 330, 339 & n. 34 (D.Del.1978). Therefore, if the City denied CDBG funds to ARC because the funds would be used for handicapped individuals, it violated § 504.

of the City's constant emphasis on the handicap of ARC's residents, we cannot say that the district court's conclusion concerning the reason for appellees' exclusion was in error. Finally, the district court's conclusion that the fourth prong of *Strathie* is likely to be satisfied was also not clearly wrong. As the district court correctly found, § 504's protection extends to any federal program or activity, *Traynor*, 606 F.Supp. at 399, including the federal CDBG program which would have provided funding to appellees but for appellants' discrimination.

In response, appellants offered the district court no substantive justification for their actions in denying CDBG funding as required by *Strathie*. As the evidence demonstrated and the district court found, the City's argument that it was attempting to preserve property values, to structure community development, and to ensure compliance with building codes had no rational basis since the only evidence adduced indicated that the continued operation of ARC would have had no negative effect on property values, ARC was already located in the community and thus could not affect development, and compliance with building codes was unnecessary for zoning approval. CL 12–16. Further, the City's arguments, even if valid, would legitimate only its denial of zoning permits, not its denial of federal CDBG funds.

Since class action plaintiffs-appellees showed a likelihood of success on each prong of the *Strathie* test, and the City failed to sustain its burden of rebuttal, we must conclude that the district court did not err in finding appellees showed the requisite likelihood of success on their Rehabilitation Act claim.

### ii. Irreparable Harm to Plaintiff

The district court's finding that class action plaintiffs-appellees were subject to irreparable harm during litigation of their Rehabilitation Act claim was, we believe, not a clear error. The district court concluded that continued operation of the Center was necessary to prevent imminent harm to recovering appellees, and that relief that guaranteed the issuance of the required zoning permits and release of federal funds needed to comply with building and fire codes was necessary to assure continued operation, FF 97, CL 28; that conclusion was amply supported. Extensive testimony and evidence established the harm to which alcoholics in the North Side Section were exposed and the actual harm (e.g., relapse and suicide) some suffered without treatment. App. at 287a. Evidence also established that appellees could find treatment only at ARC centers. FF 80, 82. Since the evidence strongly suggested that at least some appellees would be seriously injured if ARC were closed, we cannot say the court clearly erred in determining that release of the CDBG funds pursuant to § 504 was necessary to prevent harm to class action plaintiffs-appellees.

### iii. Harm to Defendant from Grant

Similarly, we cannot say the district court erred in determining the City would not suffer substantial harm by release of the CDBG funds. The evidence before the district court on the issue was clear. The funds to be released were exclusively federal and had previously been designated for ARC. FF 26, 27. As a result of the court's actions, the City's fisc was entirely unaffected. Since the City cited no potential source of harm to itself from the injunction other than loss of revenues, the district court properly concluded the injunction imposed no hardship.

### iv. The Public Interest

Finally, the district court did not err in concluding that the public interest was furthered by the issuance of the injunction. The potential harm posed to recovering appellees, as well as the surrounding community by the cessation of treatment, was extremely high. FF 82–85. The benefits ARC provides the East North Side section by treating alcoholics and reducing the burden imposed on area police and fire departments is correspondingly great. As the

district court reasonably determined, these considerations outweigh any welfare concerns about temporary occupation of structures which may not comply with building codes.

Since each element necessary for the grant of preliminary injunctive relief under *Constructors Ass'n* was satisfied in connection with class action plaintiffs-appellees' Rehabilitation Act claim, we find that the district did not err in ordering injunctive relief with respect to that claim.

## B. Equal Protection

### i. Likelihood of Success on the Merits

■ The district court also concluded that class action plaintiffs-appellees were likely to prevail on their Equal Protection claim. To have properly gained a preliminary injunction, class action plaintiffs-appellees must have demonstrated the likelihood that the instant application of Pittsburgh Code of Ordinances § 933.01 had no rational basis and thus violated the fourteenth amendment.[13]

The controlling case on class action plaintiffs-appellee's Equal Protection claim appears quite clearly to be *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).[14] In *Cleburne*, a municipality enforced an ordinance which required only certain group homes (including homes for the retarded

and alcoholics) to apply for a special use zoning permit which could be granted only by the City Council. In accordance with the ordinance, Cleburne Living Center, a group home for the retarded, applied for a special use permit. After a public hearing, Cleburne Living Center was denied a special use permit to house 13 mentally retarded patients. The record in *Cleburne* showed that the Council's decision was based at least in part on the negative attitude of the majority of property owners near the proposed site for the Center. *Id.* 105 S.Ct. at 3259. The record also showed that the Council's additional objections that the home would be located near a junior high school, would be situated on a flood plain, and would house too many patients were pretextual since retarded students already attended the junior high school, fear of flooding would not have prevented the location of a home for convalescents at the site even though convalescents might be less able than retarded persons to save themselves from a flood, and the City had failed to show why thirteen non-retarded persons could live together safely while thirteen retarded persons could not. On these facts, the Court in *Cleburne* sustained the Center's claim that the ordinance as applied violated the Equal Protection Clause of the fourteenth amendment. *Id.* 105 S.Ct. at 3260.

**13.** Since we conclude that the City's action was without rational basis, *see infra,* pp. 184–85, we do not consider whether alcoholics constitute a suspect class for purposes of the Fourteenth Amendment. *Cf. City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (rejecting claim that mentally retarded persons constitute a suspect class but sustaining claim that City's zoning decision violated Equal Protection Clause).

**14.** The City's assertion that *Cohen v. City of Philadelphia,* 736 F.2d 81 (3d Cir.1984), precluded the action before the district court is incorrect. *Cohen* held that a police officer who showed that his termination and the denial of his request for back pay upon reinstatement violated Pennsylvania law did not establish a violation of procedural due process under the United States Constitution because the state court system afforded him a prompt opportunity to correct the error in a subsequent state

proceeding. *Cohen* thus established that Pennsylvania's procedure for disposition of such claims was not constitutionally deficient, at least in this Circuit's view, and thus could not serve as a basis for a claim under 42 U.S.C. § 1983 (1982). Class action plaintiffs-appellees' claims, however, differ greatly from the police officer's in *Cohen.* Here, appellees assert that the City irrationally applied its Zoning Code—whether or not that Code satisfies federal procedural due process requirements—in violation of the fourteenth amendment to the Constitution. App. at 11a. Thus, appellees' claims, unlike the plaintiff's in *Cohen,* turn on whether the City acted without rational basis in *applying* a Code, rather than whether the City or State of Pennsylvania afforded citizens insufficient procedural protection in *enacting* Codes or statutes. Consequently, *Cohen* bars neither appellees' federal Constitutional claims nor their claims under 42 U.S.C. § 1983.

Here, the class action plaintiffs-appellees have made a similar showing. Appellees showed that the City's alleged concern about a drop in property values was irrational since ARC had operated in the neighborhood for some years and adduced evidence indicating that property values would not be adversely affected by the Center's presence. FF 63. Appellees also established that the City's alleged concern with orderly development was irrational since ARC was already located in the North Side Section. FF 64. Additionally, appellees demonstrated that ARC facilities met lot size and other zoning requirements and that the City's alleged concerns about density were addressed by density ordinances with which ARC had complied. And finally, here as in *Cleburne*, appellees demonstrated that the City took its essentially unjustified action in an atmosphere charged with hostility towards a minority group. FF 37–38. These proofs, and their lack of contradiction by the City, lead us to conclude that, in light of *Cleburne*, class action plaintiffs-appellees are likely to prevail on the merits of their Equal Protection claim.

### ii. Irreparable Harm to Plaintiff

The district court also did not clearly err in concluding that class action plaintiffs-appellees are subject to irreparable harm during litigation of their Equal Protection Claim. The evidence demonstrated that cessation of treatment threatened recovering appellees with imminent physical and psychological harm. FF 82. As when it considered appellees' federal statutory claim, the district court did not clearly err in finding that the grant of relief on the constitutional claim was necessary to ensure the continued operation needed to prevent irreparable harm to appellees.

### iii. Harm to Defendant from Grant

Similarly, we again conclude that the district court did not clearly err in finding that Pittsburgh would not be substantially harmed by the grant of injunctive relief on the constitutional claim. That relief required the City only to issue the conditional use permit to which intervenor ARC was entitled, and such other permits which the use of properly released CDBG funds would later entitle them. Since the injunction caused the City no financial or other harm, the district court could have properly concluded that the injunction imposed no hardship.

### iv. The Public Interest

Finally, we find that the district court did not clearly err in concluding that injunctive relief on the Equal Protection claim was in the public interest. Again, injunctive relief guaranteed benefits in averted physical harm and limited police and fire protection which exceeded the costs of occupation of incompletely approved structures.

Since class action plaintiffs-appellees appear to have satisfied their *Constructors Ass'n* burden with respect to each element of their Equal Protection claim, we conclude that the district court did not err in granting relief on that claim.

### VIII.

For the foregoing reasons, we will affirm the district court's grant of injunctive relief.

HUNTER, Circuit Judge, concurring:

If I were writing on a blank slate, I would hold that the district court erred in failing to abstain in this case. In my view, a federal court unduly interferes with state judicial proceedings when the federal court issues an injunction nullifying a state administrative decision that is under review in state court. The pending parallel state proceeding and this case involve the exact same legal issues, the exact same facts, and the exact same parcels of real property—under these circumstances, we disserve the federal system by appropriating the resolution of the dispute which is properly in the state system. My views are well expressed by the dissenting opinion of Judge Rosenn in *New Jersey—Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of*

*Higher Education,* 654 F.2d 868, 895–908 (3d Cir.1981). I am, however, bound to follow the majority opinion in that case. Because that opinion is apparently controlling here, I concur in the judgment.