**UNITED STATES of America, Plaintiff,**

**v.**

**BOROUGH OF AUDUBON, NEW JERSEY, Defendant.**

Civ. A. No. 90–3771.

United States District Court,
New Jersey.

Sept. 9, 1991.

Isabelle Thabault, Christine R. Ladd, Housing and Civ. Enforcement Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

George F. Geist, Voorhees, N.J., for defendant.

## OPINION

GERRY, Chief Judge.

### INTRODUCTION

The United States of America commenced this action on September 21, 1990, alleging that the defendant, Borough of Audubon, New Jersey ("Audubon" or "Borough"), has discriminated on the basis of handicap against the owners and occupants of a residential group home for recovering alcoholics and recovering drug users, in violation of the Fair Housing Act ("the Act"), 42 U.S.C. § 3601, *et seq.* A non-jury trial was held by this court on July 15–18, 1991. Based upon the testimony of wit-

nesses heard and the other evidence received during that trial, we make the following findings of fact and conclusions of law.

## BACKGROUND

*A. Establishment of Oxford House–Vassar:*

1. Since 1984, Frank and Sandra Saltzburg have owned a residence located at 50–52 East Vassar Road, Audubon, New Jersey. The residence is a three story structure, with six bedrooms, located in a residential neighborhood. Although the property is zoned by Audubon for single-family residences, prior to the Saltzburg's purchase of the property, Audubon issued a resolution permitting the residence to be used as a duplex.

2. Between 1984 and May, 1990, the residence was used as a duplex and was rented to various groups of unrelated persons. For approximately five years, the upstairs unit was occupied each year by a different group of unrelated law students. During this same period, the downstairs unit was occupied by two unrelated persons.

3. On May 8, 1990, the Saltzburgs entered into a five year lease agreement with Oxford House–Vassar ("OH–Vassar"). OH–Vassar is an unincorporated association comprised of recovering alcoholics or drug users and is patterned after the model of the original Oxford House.

4. The original Oxford House was founded in 1975 in Montgomery County, Maryland by Paul Molloy and a group of men, all of whom were recovering from alcoholism or drug addiction. When the County decided to close the half-way house in which they were living because of a lack of funds, the men decided to rent the house themselves. The purpose of the group was to provide a supportive environment in which the men could live free from drugs or alcohol. From the outset, the Oxford House was run differently than a typical half-way house. No staff was present at the house and a resident could stay as long as he wished—as long as he remained drug and alcohol free and paid his share of expenses.

5. Thereafter, other Oxford House-type homes were opened in residential neighborhoods in the Washington, D.C. area and in Pennsylvania. Since the passage of the Anti–Drug Abuse Act in 1988,[1] the number of homes has risen dramatically—to the current number of 256 homes in the United States which are operated on the Oxford House model.

6. Oxford Houses are not health care facilities, rehabilitation centers, or supervised half-way houses. Unlike those facilities, no professional treatment or paid staff are provided at Oxford Houses. Instead, such houses are simply residential dwellings that are rented by a group of individuals who are recovering from alcoholism or drug addiction. Three basic rules guide the functioning of all Oxford Houses: the House must (1) be democratically self-governing, (2) be financially self-supporting, and (3) immediately expel any person using drugs or alcohol. Because the Houses must be financially self-supporting, each resident in the House has to be able to obtain employment. There is no limit upon the amount of time that a person can live in an Oxford House. The average stay in an Oxford House is approximately 16 months.

7. New Jersey contracted with Oxford House, Inc. in 1989 to organize Oxford House-type residences within the State and to administer the $100,000 revolving fund

---

1. Pursuant to the Anti–Drug Abuse Act of 1988, 42 U.S.C. § 300x–4a, states wishing to receive federal block grant funds for alcohol and drug abuse and mental health services under the Public Health Service Act (42 U.S.C. §§ 300x and 300x–2) are required to establish a revolving fund of not less than $100,000 to make loans to help establish group homes for recovering alcoholics and drug abusers. Under that Act, groups of four or more recovering alcoholics or drug users who want to live in a group home based on the Oxford model are entitled to a loan of up to $4,000 to cover the start up expenses of renting a home. The loans are interest free and must be repaid by the residents of the home within two years. The only requirements are that the houses be (1) democratically self-governing, (2) financially self-supporting, and (3) that any person using drugs or alcohol be immediately expelled. 42 U.S.C. § 300x–4a(a)(6).

established by New Jersey pursuant to the Anti–Drug Abuse Act. Pursuant to that contract, Oxford House, Inc. initially was required to send experienced Oxford House residents to New Jersey to help establish the first few houses and thereafter was required to locate available housing for rental, to negotiate leases, to coordinate with other community organizations and agencies, and to otherwise facilitate the establishment of Oxford Houses in the State. There are currently 18 Oxford Houses in New Jersey.

8. Once established, Oxford House, Inc. has no ongoing control over an Oxford House. The residents living in the particular house make all of the decisions regarding the management of the house—including the decision as to who is permitted to move into the house.

9. OH–Vassar was initially established by Oxford House, Inc. Charles Van der Burgh, Chief Financial Officer for Oxford House, Inc., signed the lease with the Saltzburgs for the East Vassar Street residence on behalf of OH–Vassar. The original residents of OH–Vassar were initially selected and approved by Oxford House, Inc. A requirement for approval is that the residents "are actually in recovery; that they're not practicing alcoholics or drug users, but have had some sort of intervention in their addiction and some sort of treatment." Trial Transcript of July 15, 1990, at p. 103, line 12—p. 104, line 5 (hereinafter, e.g., "TT 15: 103.12–104.5"). Each of the four initial residents of OH–Vassar had attended a residential treatment program. Subsequent residents were all referred to OH–Vassar by counselors at a treatment facility.

B. *Interaction With the Borough of Audubon:*

10. Audubon is a municipality located in Camden County, New Jersey, and is organized under the laws of the State of New Jersey. Audubon's government is run by a Board of Commissioners which is comprised of a Mayor and two Commissioners. The current Mayor is Alfred Murray, and the current Commissioners are James Johnson and Norman Brecht. All three were in office during the summer of 1990.

11. Commissioner Brecht is charged with overseeing the enforcement of the Borough's zoning codes and/or ordinances, through consultation with the Borough's zoning solicitor, Barry Wendt, its zoning enforcement officer, Charles Martin, and members of the Borough's Zoning Board.

12. Soon after the initial residents moved into OH–Vassar in June, 1990, Borough officials began receiving complaints from local citizens—who complained, for example, that loud music was being played, that the residence was being used as a boarding home, that the grass was uncut, that people were coming and going constantly, and that the home was a drug and alcohol rehab center. Beginning in late June, 1990, Martin made repeated visits to OH–Vassar, during which he inspected parts of the home, questioned residents about their identities and the operation of the home, and told the residents that they were living there in violation of town ordinances.

13. In an attempt to resolve the alleged violations of local ordinances, a meeting was held on July 3, 1991, between the Saltzburgs, Zoning Solicitor Wendt, Zoning Officer Tom Costello, the Fire Marshall, a representative of the Board of Health, and Commissioner Brecht. The end result of this meeting was that the Saltzburgs were told they had two options: they could either apply for a variance to use the property as a boarding home or have the residents of OH–Vassar vacate the property. The Saltzburgs were given a week in which to comply and were told that if neither was done, the Borough would issue summonses for the Saltzburgs to face charges in Municipal Court.

14. The Saltzburgs did not apply for a variance, and the residents of OH–Vassar did not vacate the property. Thereafter, per his instructions from Commissioner Brecht, Zoning Officer Martin began issuing citations to the Saltzburgs on a weekly basis. The citations alleged violations of ordinances covering noise, parking, occupancy permits, zoning, as well as more

general provisions. The summonses listed the offense as running a boarding home. In addition to the summonses, a Notice of Violation and Order to Terminate was served on the Saltzburgs on July 20, 1990, which charged the Saltzburgs with a violation of the State Uniform Construction Code Act for failing to apply for a change of use to convert the house into a boarding home.

15. On August 6, 1990, the Saltzburgs appeared in Audubon Municipal Court for a hearing on the summonses issued to them by Martin. However, Audubon voluntarily consented to stay prosecution of the Municipal Court actions pending the court's resolution of the present suit.

## DISCUSSION

1. The United States filed this suit against Audubon alleging that Audubon's effort to prevent the operation of OH–Vassar violated the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

▆ 2. Section 3604(f) of the Act makes it unlawful

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

The Act specifically defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

3. Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 of this title.

4. These provisions prohibit discriminatory housing practices by municipal governments as well as private parties. *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329 (D.N.J.1991) (challenging city's efforts to prevent operation of local Oxford House in area zoned for single family residences) (*OH–Evergreen* ). *See also Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3rd Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1068 (4th Cir. 1982); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II* ); *United States v. Yonkers Board of Education,* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2nd Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *United States v. City of Birmingham,* 538 F.Supp. 819 (E.D.Mich.1982), *aff'd and modified as to relief,* 727 F.2d 560 (6th Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

5. At the outset, we want to make clear that we think the issue of whether or not the use of the premises at 50–52 Vassar Road violates Audubon's zoning ordinance is not an issue for this court to decide. That issue is a state law question which, as discussed above, is presently before the Audubon Municipal Court. In this action, we are concerned only with the question of whether or not, even assuming that the use of the premises violates Audubon's zoning ordinance, plaintiff is entitled to the relief it seeks because Audubon has discriminated against individuals on the basis of a handicap.[2]

---

2. We note that Audubon does not argue that we should abstain from deciding this issue in deference to the Municipal Court action. On the contrary, Audubon has voluntarily stayed the prosecution of that action pending our resolution of this case.

*A. Handicap Status Of The Residents:*

■ 6. The threshold question we must decide is whether or not the residents of OH–Vassar are "handicapped" within the meaning of the Act—i.e., whether or not they are protected under the Act. We conclude that they are.

7. Under the Act,

"Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of a person's major life activities,

(2) a record of having such an impairment,

(3) being regarded as having such an impairment.

42 U.S.C. § 3602(h). This definition was modeled on Section 7 of the Rehabilitation Act, 29 U.S.C. § 706(8)(B), which prohibits programs receiving federal funds from discriminating on the basis of a handicap. As the House Report states:

> This language is substantially similar to the definition under the primary federal law prohibiting discrimination against the handicapped, the Rehabilitation Act of 1973. The Committee intends that the definition be interpreted consistent with regulations clarifying the meaning of the similar provision found in section 504 of the Rehabilitation Act.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), U.S.Code Cong. & Admin.News 1988, pp. 2173, 2183.

8. We find that plaintiff has proven by a preponderance of the credible evidence that the OH–Vassar residents are "handicapped" within the meaning of § 3602(h).

9. Audubon does not dispute that alcoholism and drug addiction are "physical or mental impairments". *See* 24 C.F.R. § 100.201(a)(3). And, Audubon does not dispute that the residents are all recovering alcoholics or recovering drug users. All of the residents who testified at trial testified that they had a background of drug or alcohol addiction, that they had attended some sort of rehabilitation program prior to arriving at OH–Vassar, and that alcoholism is a life-long disease.

10. However, Audubon argues that plaintiff failed to prove that the OH–Vassar residents are substantially limited in their major life activities. Under the regulations promulgated by the Department of Housing and Urban Development to effectuate the provisions of the Act, "major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b). Because the OH–Vassar residents who testified at trial stated that they could walk, see, hear, speak, breathe, learn and work, Audubon concludes that they were not substantially limited in their major life activities.

11. We cannot agree with Audubon's limited interpretation of "major life activities", and we find that the OH–Vassar residents' drug and/or alcohol addiction did substantially impair one or more of their major life activities. Initially, we note that courts have uniformly held that persons suffering or recovering from alcoholism and/or drug addiction are "handicapped" under the Rehabilitation Act. *See, e.g., Sullivan v. City of Pittsburgh,* 811 F.2d 171, 182 (3rd Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Rodgers v. Lehman,* 869 F.2d 253, 258 (4th Cir.1989); *Crewe v. U.S. Office of Personnel Management,* 834 F.2d 140, 141 (8th Cir.1987); *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226, 1331 n. 8 (7th Cir.1980); *Tinch v. Walters,* 765 F.2d 599 (6th Cir. 1985); *Davis v. Bucher,* 451 F.Supp. 791 (E.D.Pa.1978).

12. Le-Etta Welde, a former OH–Vassar resident, testified that she could not live with her parents because they drank, and she was afraid that she would relapse—go back to drinking again—if she lived in that environment. TT 16: 14.5–14.7.[3] She also stated that she needed to

---

**3.** Welde's fear was ultimately realized. She moved back home with her parents when she moved out of the OH–Vassar residence, and relapsed within three months.

live in "a place that I could go home to without alcohol and drugs, where there wasn't going to be a bar on the corner, someplace that I can't, didn't know and had a chance to stay sober in." TT 16: 14.15–14.19. She testified that OH–Vassar provided a supportive environment which was necessary because "when you need somebody to talk to, you need another recovering alcoholic or addict to talk to; a normal person that doesn't know addiction or recovery wouldn't understand some of the problems that we go through." TT 16: 52.4–52.8.

13. Elarie Parker, also a former OH–Vassar resident, testified that she had to live in a place like OH–Vassar because she needed to be in an environment where there was not easy access to drugs or alcohol and where she was able to enjoy the support of other recovering addicts. TT 16: 62.5–62.8. Parker went back to using drugs and alcohol when she left OH–Vassar and returned to her previous environment. TT 16: 62.11–62.17. Thereafter, she moved into a residential rehabilitation program and has remained sober since that time. She stated that the key to her ability to remain sober is the support she receives from other recovering addicts. TT 16: 72.6–72.17.

14. The testimony of Welde and Parker is supported by the testimony of Riley Regan. Regan has been a recovering alcoholic for 24 years and has obtained extensive personal knowledge of the effects of alcoholism through his 15 years of work in the treatment and prevention of alcoholism and drug abuse, and through his current employment as the Executive Director of the Governor's Council on Alcoholism (in New Jersey). As Regan states, the "possibility

of relapse is always there, the possibility of falling right back into the skid row existence is, is there. All of the research and all of the personal experiences indicate that an individual has to be in a supportive environment, has to be around other people that don't drink, and has to be in a program of recovery forever." TT 17: 55.20–56.1.[4]

15. Based on the testimony discussed above, we find that the OH–Vassar residents' addictions substantially limit their ability to live independently and to live with their families. Accordingly, we find that the residents are "handicapped" under, and are entitled thereby to the protections of, the Act. We do not think that the list of major life activities set forth in the regulation was meant to be all-inclusive. Even if it were, the residents would still satisfy the definition because their inability to live independently constitutes a substantial limitation on their ability to "care for themselves".

## B. Discrimination On The Basis Of A Handicap:

16. Having determined that the residents are entitled to the protection of the Act, we now must turn to the question of whether Audubon has discriminated against them on the basis of their "handicap." We find that Audubon has.

17. The Fair Housing Act makes it unlawful to "make unavailable or deny" a dwelling because of a handicap. 42 U.S.C. § 3604(f)(1). To establish a *prima facie* case under the Act, a plaintiff must show either "discriminatory treatment, or discriminatory effect alone, without proof of discriminatory intent." *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3rd Cir.1989)

The court is pleased to note however that since then, Welde was able to obtain her own home and has been drug and alcohol free for the past six months.

**4.** At trial, counsel for Audubon objected to portions of Regan's testimony on the grounds that no expert witnesses were identified in the Final Pretrial Order and that Regan was about to give an expert opinion. The United States argued that it was seeking to elicit only a lay opinion, and we permitted the testimony with that limitation. We find that the opinions expressed by

Regan, for the most part, are admissible as lay opinions. Under Rule 701 of the Federal Rules of Evidence, lay opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the ... determination of a fact in issue." Regan's testimony was based on his many years of personal experience in treating and dealing with alcoholics and drug addicts, and we find that the testimony is helpful to a determination of facts at issue in this case.

(citations omitted). If a defendant's acts are undertaken with an improper discriminatory motive, the Act is violated even though those acts may have otherwise been justified under state law. *Woods–Drake v. Lundy,* 667 F.2d 1198, 1202 (5th Cir.1982); *United States v. City of Parma, Ohio,* 494 F.Supp. 1049, 1099 (N.D.Ohio 1980), *aff'd,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982) ("Actions which are typically lawful ... lose that character when they are undertaken for a discriminatory purpose") (citations omitted). Therefore, although a municipality has a legitimate governmental interest in regulating land use, we have a duty under the Act to ensure that that interest is effectuated in a nondiscriminatory manner. *OH–Evergreen, supra,* 769 F.Supp. at 1344. *See also* 42 U.S.C. § 3615 ("any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under [the Act] shall to that extent be invalid").

18. We conclude that a predominant motivation behind the actions of Audubon officials was discriminatory animus. The record is replete with evidence, both circumstantial and direct, which exposes this discriminatory purpose.

19. For example, this discrimination is revealed by comments made by Audubon officials during the course of regular monthly meetings of its government. In response to complaints from local citizens at the meeting held July 17, 1990, Mayor Murray stated, "the minute that I found out about it, I shared the same sentiments as the residents on Vassar Road. And, unfortunately, there is nothing more that I would like to do than to just come in and just tell these people you have until noon to get out of town." TT 15: 88.15–88.19. Mayor Murray continued,

> When made aware of it—all three commissioners have been working on this from three different directions trying to arrive at the first solution and the fastest solution. I can assure you of that. Commissioner Brecht has been working on the zoning end of it, Commissioner Johnson has been in contact, I believe, with Lee Laskin.... As well as some other people. And I have been working with our Municipal Court because the court falls under my thing. As soon as I was made aware of this, I was in contact with our solicitor and I was in contact with our prosecutor, Dan Weitzman. The solicitor and our prosecutor have been working to arrive at an effective solution to get this thing over with. Tonight I stand prepared to appoint George Geist, our solicitor, as special counsel and special prosecutor to direct all the attention focused on this specific project, being 52 [SIC] East Vassar Road.

TT 15: 90.21–91.8. Murray later stated that "I appreciate your concerns, and as I stated before, this is the number one thing on our agenda at this time. Everything else is pretty much taking a back seat." TT 16: 154.19–154.22. Murray also stated that "We are not in the social services to solve everyone's problems." TT 16: 155.-10–155.11.

20. At that same meeting, Solicitor George Geist said that he "has recommended to the municipal prosecutor that he should seek the most severe monetary penalty to establish an effective deterrent to this ongoing activity." TT 15: 90.6–90.8. Solicitor Geist went on to say that

> local officials could probably paper the walls of this complex with daily issuances on a daily basis. Now, the first charge was supposed to incorporate the language for each and every day subsequent thereto. But, candidly, I think it would be much more effective if the police community within the Borough served him on a daily basis the charges issued by the respective construction code officials. And I would like to in a sense oversee a conference of the police community with the prosecutor, with the zoning official, with the construction officials, so that candidly on a joint endeavor under the directive of the commissioners, we tag-team the individual through the respective Borough officials.

TT 15: 90.21–91.8.

21. Although this zealous enforcement of local zoning ordinances would not neces-

sarily connote discrimination if standing alone, it clearly evidences a discriminatory motive when considered in conjunction with Audubon's prior enforcement practices. Zoning Officer Martin testified that the citations issued to the Saltzburgs were the *first* citations he had issued in his one and a half year tenure as a zoning officer. The Audubon Court Administrator, Kathleen Dollarton, testified that, between 1986 and April 18, 1991, no other citations were issued for violations of the ordinances allegedly breached by the OH–Vassar residents.

22. Despite this history of a general lack of enforcement, the alleged violations by OH–Vassar were placed at the very top of the borough's agenda, all branches of the local government were brought together to "tag-team" the Saltzburgs, and help was even sought from the local state senator. This contrast cannot be explained merely by the fact that Audubon officials thought that the OH–Vassar residents were too noisy, violated the parking ordinance, or did not constitute a "single-family". Rather, we find that Audubon's response was motivated by discrimination against the OH–Vassar residents on the basis of their status as recovering alcoholics and drug users.

23. Audubon cannot avoid this conclusion by arguing that its actions were merely a response to community sentiment. Discriminatory intent may be established where animus towards a protected group is a significant factor in the community opposition to which the commissioners are responding. *Yonkers Board of Education,* 837 F.2d at 1223–1224; *A.F.A.P.S. v. Regulations & Permits Admin.,* 740 F.Supp. 95, 104 (D.Puerto Rico 1990);[5] *City of Birmingham,* 538 F.Supp. at 828.[6] The sentiments expressed in these cases is particularly applicable in this case because, on several occasions, Audubon officials stated that they agreed with or were responding directly to community opposition[7] which was clearly discriminatory.[8]

24. Moreover, the Act was specifically intended to protect individuals against com-

---

**5.** As the court said in *A.F.A.P.S.,*

in the ordinary course of affairs a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents. On the other hand, a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process. A racially discriminatory act would be no less illegal simply because it enjoys broad political support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter.

*Id.*

**6.** As the court said in *City of Birmingham,*

The government need not prove that the [decision-making body] itself intended to discriminate on the basis of race in order to establish that the City acted with a racially discriminatory intent. In order to demonstrate a city's racially discriminatory intent, it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the moti-

vations of the private citizen[s].... Any other rule of law would permit a legislative body to place its official stamp of approval on private racial discrimination.

*Id.* (citation omitted).

**7.** *See, e.g.,* TT 15: 88.15–88.17 (Mayor Murray: "the minute that I found out about it, I shared the same sentiments as the residents on Vassar Road"); TT 16: 157.4–157.5 (Unnamed borough official in response to comment from citizen, "What makes you think we are not with you"); TT 16: 157.16–157.18 (Solicitor Geist: "We have advised HUD, and they should be aware that we are merely responding to the complaints of the residents"); TT 16: 158.11–158.15 (Solicitor Geist: "our conduct is merely a responsive conduct, since we are [a] government of and by and for the people of the Borough of Audubon").

**8.** The following is an example of a complaint by a local resident:

The problem is what their addiction is. That is the problem. You don't want drugs in your neighborhood but you're being—it's being shoved down your mouth. You want to keep a nice neighborhood; you want to keep it drug free, but they bring it in and say, here you are; take it or leave it; pay your taxes, support them, everything.... This nonsense has got to stop. We have been mollycoddling these drug addicts and these alcoholics like they are the best people in the world.

Plaintiff's Exhibit 22, at 97–98.

munity perceptions of their handicaps. As the Supreme Court recognized in *School Board of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987), by defining "handicap" to include persons regarded as having an impairment, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitation that flow from actual impairments."

25. The devastating effects of such myths and fears is amply demonstrated by the testimony in this case. Le–Etta Welde explained,

> Approximately a week after I moved in, I was mowing the back yard and two older ladies that lived on the side of us had come out and started talking to me. And they were very nice, they said oh, you just moved in; I said yeah. And there's a couple other girls; I said yes, you know, we're just renting the house. She goes we're so glad, you know, 'cause it was vacant for a while, and it looks so nice, you guys are cleaning up the yard really nice. I said thank you. Next day I was out there just raking up, ... and she came over and gave me some flowers from her rose garden. I thought well, this is going to be a really nice neighborhood. [However, after an article appeared in the paper explaining that the women were recovering alcoholics and drug users, the attitude of the neighbors was] [i]mmediately, totally 100 percent different. The lady wouldn't even say hello any more. The gentleman across the street would stand on his curb and talk to the other neighbors and point at the house. If I walked down the street and said hi, people would ignore me, where before they would say hi back. It was a total shut down.

TT 16: 52.13–53.17. In fact, the tension and stress caused by the community opposition and by the Borough's efforts ultimately forced Welde and several other women to leave OH–Vassar. As Welde explained,

> we had gone through a lot of things; we've already gone through a municipal hearing; a lot of the girls were leaving, new girls were coming in. Trying to explain the situation of the Township to the new girls was giving them a lot of undue stress, and I, it was just unbearable. You couldn't walk down the street any more and say hello, and people—without people just glaring at you. Some neighbors would actually stand on the corner and point and talk, and you, you knew they were talking about that that's the house, you know, (Pointing).

TT 16: 25.16–25.25.

26. For the foregoing reasons, we hold that Audubon has violated § 3604(f) of the Act—by taking actions "to make unavailable or deny" the Vassar Road home to the OH–Vassar residence "because of a handicap," and § 3617 of the Act—by taking actions to "coerce, intimidate, threaten, or interfere with [the OH–Vassar residents] in the exercise or enjoyment of ... any right granted or protected" by the Act.

### C. Relief:

27. Having found that Audubon violated the Act, we

> (A) may award such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation of this title as is necessary to assure the full enjoyment of the rights granted by [the Act];
>
> (B) may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved; and
>
> (C) may, to vindicate the public interest, assess a civil penalty against the respondent—
>
>> (i) in an amount not exceeding $50,000 for a first violation; and
>>
>> (ii) in an amount not exceeding $100,-000 for any subsequent violation.

42 U.S.C. § 3614(d)(1). We do not award any relief under subsection (B) above because a separate action brought by the Saltzburgs and some of the residents of OH–Vassar and by the Saltzburgs, (*Oxford House Vassar, et al. v. William Taulane, et al.*, C.A. No. 90–3762 (D.N.J.)), was voluntarily settled by the parties.

28. We think that injunctive relief under subsection (A) above is appropriate to insure that Audubon takes no further steps to interfere with the operation of OH–Vassar or any other similar group living arrangement of handicapped persons. Mayor Murray's statement that he wanted "to stop the proliferation of this type of set-up," TT 15: 91.20–91.22, demonstrates an intent to prevent other group living arrangements for handicapped persons from locating in Audubon.

29. We shall also award a civil penalty under subsection (C), in the amount of $10,000.00. We have found that Audubon officials acted with an intent to discriminate on the basis of a handicap, and we believe that this penalty is necessary to serve the purposes of both retribution and deterrence. The United States has sought a much more severe monetary penalty. However, there is no evidence in the record that Audubon has engaged in discriminatory conduct outside the context of this case; and, without such evidence, we are willing to view this case as an aberration which necessitates less than the maximum penalty allowed by law. However, we want to emphasize that Audubon officials are hereby on notice, through receipt of this opinion by the Solicitor for Audubon, that similar discriminatory conduct in the future will not be tolerated and will not meet with the same leniency it has met with in this case.

30. The United States argues that, in addition to the sanctions imposed above, some affirmative requirements—such as requiring special fair housing instruction to officials and employees who may be involved in the interpretation of zoning requirements and requiring Audubon to report to the United States any proposed changes in its zoning ordinances for a period of five years—are also appropriate. However, we do not think that such measures are warranted at this time. Given the other sanctions we are imposing, we are confident that Audubon officials will hereafter diligently comply with the mandates of the Fair Housing Act. Again, we emphasize that if our confidence proves to be misplaced, we will not hesitate to impose more stringent sanctions.

## CONCLUSION

For the foregoing reasons, we hold that Audubon has violated the Act by discriminating against the OH–Vassar residents and the Saltzburgs on the basis of a handicap. Accordingly, we shall impose sanctions in the form of a permanent injunction, and a civil penalty in the amount of $10,000.00.

The accompanying order has been entered.