530 S.E.2d 636

**COUNTY OF CHARLESTON, A Political Subdivision
of the State of South Carolina, Respondent,**

v.

**SLEEPY HOLLOW YOUTH, INC., Appellant.**

**No. 3153.**

Court of Appeals of South Carolina.

Heard March 9, 2000.
Decided April 17, 2000.

Julius H. Hines, of Buist, Moore, Smythe & McGee, of Charleston, for appellant.

Stephen P. Groves, Sr., Wilbur E. Johnson, Nancy Bloodgood and Stephen L. Brown, all of Young, Clement, Rivers & Tisdale, of Charleston, for respondent.

HOWARD, Judge:

Sleepy Hollow Youth, Inc. appeals the trial court's order granting summary judgment in favor of the County of Charleston in which the court found Sleepy Hollow failed to present any evidence of a violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (1999) (FHA). We reverse and remand.

## FACTS/PROCEDURAL HISTORY

In July 1995, Jay Spateholts incorporated Sleepy Hollow Youth, Inc. (Sleepy Hollow) as a private non-profit corporation. Sleepy Hollow planned to operate a home for six to eight emotionally disabled children. While applying for a license from the South Carolina Department of Social Services (SCDSS) and approval as a Medicaid provider from the Health and Human Services Finance Committee, Sleepy Hollow initiated a search for an appropriate site. In January 1996, Sleepy Hollow leased a house with an option to purchase on Johns Island in Charleston County.

A number of residents on Johns Island opposed Sleepy Hollow's intended use of the property. The residents wrote letters to SCDSS expressing their opposition to the group home in an attempt to persuade SCDSS to deny Sleepy Hollow's license for the home. Initially, SCDSS denied Sleepy Hollow's application. However, upon further review, SCDSS granted the license.

In addition, the residents contacted the building inspectors incorrectly asserting Sleepy Hollow was engaging in construction without a building permit. These residents then contacted a business licensing official complaining Sleepy Hollow was operating a business without a license even though Sleepy Hollow was only preparing the site and was not yet operational. Eventually, one resident expressed his concerns to the County of Charleston (the County).

On February 12, 1996, Nancy Bloodgood, an attorney for the County, called Spateholts requesting a letter explaining Sleepy Hollow's purpose and intentions. Spateholts responded that day. Three days later he attended a meeting of the County's finance committee. At that meeting, a lawyer for the residents presented their objections to County Council. The committee did not recognize Spateholts and would not allow him to speak at this meeting.

County Council met on February 20, 1996. The objecting residents, Spateholts, and the respective attorneys were present at the meeting. Both sides were allowed to present their positions. County Council decided to object to the proposed group home site invoking the procedure outlined in S.C.Code Ann. § 6–29–770 (Supp.1999). The stated basis for the objection was the "concerns expressed by members of the community."

Section 6–29–770 states that when a local government objects to a proposed site for a group home, representatives from the entity seeking to establish the group home and the governmental entity appoint a third mutually agreeable person, and those three persons then have forty-five days to find an alternate site for the group home. The final selection is determined by a majority vote and is binding on the group home and the governing body. If no alternate site is selected, the entity establishing the home selects the site without further proceedings.

In this case, the County nominated William Dean, one of the residents who opposed the group home, as its representative. Dean and Spateholts, who was Sleepy Hollow's designated representative, could not agree on the third member of the committee.

Sleepy Hollow began operating in July 1996. On September 24, 1996, the County brought this action seeking Sleepy Hollow's compliance with the statute.[1] The County requested an order temporarily enjoining Sleepy Hollow from operating the group home until it complied with the statutory require-

---

1. Although the County brought the action seeking Sleepy Hollow's compliance with S.C.Code § 6–7–830(a) (Supp.1999), the trial court's decision is based on S.C.Code § 6–29–770 (Supp.1999), which contains provisions identical to S.C.Code § 6–7–830(a) (Supp.1999).

ments. At the bearing on the County's motion for a temporary injunction, Sleepy Hollow agreed to participate in the site selection process with a different representative from the County. The court ordered the County to appoint a new representative and found that five days would be a reasonable time for the representatives to select the third member of the committee. The court directed the parties to act in good faith in selecting the third person within this time.

The County designated Edward Bryant as its replacement representative. Spateholts found Bryant unacceptable because Bryant and his wife had written a letter to SCDSS opposing the group home. Sleepy Hollow answered the County's complaint and asserted various counterclaims, including allegations that the County's actions violated the FHA and that Sleepy Hollow was entitled to actual damages, punitive damages, and attorneys fees from the violation.

The County moved for summary judgment asserting Sleepy Hollow's first eight counterclaims were moot because Sleepy Hollow had voluntarily abandoned the site. In addition, the County asserted Sleepy Hollow's remaining claim for damages and attorneys fees failed because there was no evidence to create a genuine issue of fact as to whether the County engaged in conduct violating the FHA. Sleepy Hollow agreed the County's claim and its own first eight counterclaims were moot because Sleepy Hollow ceased operation of the group home on Johns Island, but maintained its counterclaim for damages remained viable and presented issues for trial.

The trial court found Sleepy Hollow failed to allege or prove any discriminatory motive or act on the part of the County and, thus, failed to establish a prima facie case of violation of the FHA. The trial court held that the County complied with state law, which is presumed constitutional and which Sleepy Hollow had not alleged to be unconstitutional. Therefore, the actions taken by the County, taken alone, were not discriminatory. Accordingly, it granted the County's motion for summary judgment.

## STANDARD OF REVIEW

"Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law." *Summer v. Carpenter*, 328 S.C. 36, 42, 492 S.E.2d 55, 58 (1997); Rule 56(c), SCRCP. "Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." *Tupper v. Dorchester County*, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997). Even when there is no dispute as to evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Id.* All ambiguities, conclusions, and inferences arising from the evidence must be construed most strongly against the movant. *True v. Monteith*, 327 S.C. 116, 489 S.E.2d 615 (1997).

The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact. *Baughman v. American Tel. and Tel. Co.*, 306 S.C. 101, 410 S.E.2d 537 (1991). Summary judgment is a drastic remedy and should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues. *Id.*

## DISCUSSION

As amended in 1988, the Fair Housing Act (FHA) protects people with disabilities against discrimination in housing. 42 U.S.C. § 3601 *et seq.* (1999). Normally, the threshold question facing a court is whether or not the individuals are "handicapped" within the meaning of the FRA, and thus whether or not they are protected under the Act. The only named appellant in the present case is Sleepy Hollow, the sponsor of the group home. Therefore, the threshold question becomes whether Sleepy Hollow has standing to bring the present action.

The FHA prohibits housing discrimination not only where handicapped persons seek to buy or lease a dwelling themselves, but also where they intend to reside in the dwelling after it is bought or rented by another, or where they are "associated" with the buyer or renter. *See* 42 U.S.C. § 3604(f)(1) (1999). Federal courts have held that a person who is not himself handicapped, but who is prevented from providing housing for handicapped persons, has standing to sue under the FHA. *See, e.g., Judy B. v. Borough of Tioga,*

889 F.Supp. 792 (M.D.Pa.1995) (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Therefore, group home sponsors, such as Sleepy Hollow, have standing to bring FHA claims, though they are not themselves "handicapped."

■ This Court recognizes legislators and administrators are properly concerned with balancing numerous competing considerations and thus, we will normally refrain from reviewing the merits of their decisions, absent evidence of arbitrariness or irrationality. However, discrimination is not just another competing consideration. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

■ The County may apply non-discriminatory land use considerations, such as traffic or parking concerns, when determining whether to object to a proposed group home site. However, South Carolina Code § 6–29–770 provides local governments with no guidance or criteria regarding when they may invoke this procedure. In the present case, the County never articulated any zoning or land use rationale for its opposition to the group home site. Instead, the County, by its own admission, based its decision solely on the concerns expressed by the community. Therefore, we are obligated to examine the County's decision in order to ensure that the statute was not haphazardly applied and to determine what factors truly led to the County's objection.

The majority of courts applying the FHA have concluded that a cause of action under the Act against a local government may arise under any one of three theories. First, a plaintiff may allege that the local government's decision was based on intentional discrimination against the disabled, otherwise known as "discriminatory intent" or "disparate treatment." *Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir.1995). Second, a facially neutral regulation, practice or policy may violate the FHA if it has a "disparate impact" or "discriminatory effect" upon people with disabilities. *See Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982). Lastly, a local government's failure to make a reasonable

accommodation for people with disabilities may give rise to a cause of action under the FHA. 42 U.S.C. § 3604(f)(3)(B) (1999). Since appellant alleges facially discriminatory actions and not the effects of facially neutral actions, we conclude that appellant's claim is one of disparate treatment and not disparate impact.

Sleepy Hollow may show disparate treatment by proving that the County would not have objected to the proposed site but for discriminatory animus toward the handicapped. Sleepy Hollow must show that this "discriminatory purpose was a motivating factor" in the County's decision to object to the site. *See Arlington Heights,* 429 U.S. at 270, 97 S.Ct. 555.

In order to prove intentional discrimination, Sleepy Hollow need not show an evil or hostile motive. It is a violation of the FHA to discriminate even if the County's motive was benign or paternalistic. *See Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683 (E.D.Pa.1992), *aff'd,* 995 F.2d 217 (3rd Cir. 1993).

> An actionable intent to discriminate need not be motivated by dislike for, or animosity against, people with disabilities; the legislative history of the Fair Housing Act shows that Congress intended equally to prohibit discrimination resulting from "false and over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose."

*Bryant Woods Inn, Inc. v. Howard County,* 911 F.Supp. 918, 929 (D.Md.1996), *aff'd,* 124 F.3d 597 (4th Cir.1997) (citation omitted).

Nevertheless, a complainant alleging intentional discrimination has the initial burden of showing that the decision to deny housing opportunities was motivated, at least in part, by unjustified consideration of the disabled status of individuals who would be affected by the decision. *Id.* In this regard, government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others. *See Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir.1970) (holding, in a § 1983 racial discrimination action, that "it is enough for the

complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals"); *see also United States v. Borough of Audubon,* 797 F.Supp. 353, 361 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3rd Cir.1992).

We acknowledge that government officials may attempt to conceal discriminatory intent by claiming they relied upon objective, neutral criteria. However, if a defendant's acts are undertaken with a discriminatory motive, the FHA is violated even though such acts may have otherwise been justified under state law. *Audubon,* 797 F.Supp. at 360. In this regard, "[o]therwise lawful governmental actions become unlawful when done for the purpose of disadvantaging the handicapped." *Smith & Lee Assocs., Inc. v. City of Taylor,* 102 F.3d 781, 790 (6th Cir.1996). Therefore, although the local government has a legitimate governmental interest in regulating land use, we have a duty under the FHA to ensure that such interest is effectuated in a nondiscriminatory manner. *See* 42 U.S.C. § 3615 (1999) ("any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under [the Act] shall to that extent be invalid").

Determining whether a discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555. The Fourth Circuit Court of Appeals has noted that,

> officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate. . . . Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their [prejudice], that open statements of discrimination are made, so it is rare that these statements can be captured for the purposes of proving . . . discrimination in a case such as this.

*Smith v. Town of Clarkton,* 682 F.2d 1055, 1064 (4th Cir.1982). Nonetheless, upon review of the record, we find enough

circumstantial and direct evidence of intent in this case to justify further inquiry by the trial court.

The residents mounted a letter-writing campaign stating their objections to the location of the group home. These letters contained concerns that the children could not appreciate certain dangers inherent in living in a rural area next to a creek. The neighbors voiced concerns that the children could not recognize and avoid poisonous snakes; that the children would not know how to respond during an attack by a pack of wild dogs; that the children would wander into the woods and accidently be shot by a hunter; and that the children may drown in the nearby creek or pool. Although these objections are couched in a protective attitude towards the children, further inquiry is necessary because the FHA was intended to prohibit discrimination based on false and overprotective assumptions about the needs of the handicapped. *See Bryant Woods,* 911 F.Supp. at 929.

There is also evidence that the residents opposed the placement of the group home in what the residents felt was a desirable neighborhood. One resident made remarks regarding the fact that the children would be living in a luxury home that few people could ever afford to own. In addition, another resident commented that "placing eight disturbed and/or abused children, who are unrelated ... with a similar or larger number of unrelated and low-paid adults in a home which none of them will own will adversely affect the neighbors and their property." A resident even suggested that the group home be removed to a house trailer. These particular remarks, when viewed in a light most favorable to Sleepy Hollow, express an underlying discriminatory attitude towards the handicapped.

Even before the children arrived at the group home, the residents characterized themselves and the neighborhood as hostile to the children. In an April 1, 1996 letter to SCDSS, one resident described "a hostile environment where the neighborhood does not want this facility."

In a light most favorable to Sleepy Hollow, the hostile treatment continued after the children arrived. A large sign was placed in a driveway reading "group home for troubled youth next driveway." At least one resident insisted that he

would conduct frequent photographic recording, potentially with the use of a telephoto lens, of the group home in order to track the number of children residing in the home.

We find that these letters, comments and hostile treatment establish evidence of discrimination by the residents when viewed in a light most favorable to Sleepy Hollow. The residents, as constituents, then voiced these "concerns" to the County. The County objected to the location of the group home in response to the request of its constituents. Therefore, a factual issue is presented as to whether the County, by implementing the potentially discriminatory desires of their constituents, acted with discriminatory intent. *See Dailey,* 425 F.2d at 1039.

The trial court noted that the present case is distinguishable from *Audubon.* In *Audubon,* the District Court found the record to be "replete" with circumstantial and direct evidence exposing the municipality's discriminatory purpose. 797 F.Supp. 353 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3rd Cir.1992). We make no determination as to whether the record in this case is "replete" with evidence of the County's discriminatory purpose. However, we find there is a factual issue presented as to whether a discriminatory purpose was a motivating factor in the County's decision to object to the location of the group home.

We note a showing that the County's decision was motivated, at least in part, by discriminatory intent is not a dispositive question in this case. Once a plaintiff shows that a defendant's decision was motivated, at least in part, by discriminatory intent, the burden then shifts to the defendant to prove that it would have made the same decision even if the impermissible purpose had not been considered. *Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. 555; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (holding that the district court "should have gone on to determine whether [defendant] had shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.").

## CONCLUSION

For the foregoing reasons, the trial court's decision is reversed and the case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

GOOLSBY and CONNOR, JJ., concur.