HISPANICS UNITED OF DUPAGE
COUNTY, et al., Plaintiffs,

v.

VILLAGE OF ADDISON, ILLINOIS,
Defendant.

UNITED STATES of America, Plaintiff,

v.

VILLAGE OF ADDISON, ILLINOIS,
Defendant.

Nos. 94 C 6075, 95 C 3926.

United States District Court,
N.D. Illinois,
Eastern Division.

March 19, 1997.

Robert L. Graham, Edward Jacob Lewis, II, Thomas Charles Buchele, Dan Avram Rosenbaum, Jennifer A. Burke, Jenner & Block, Edward Arthur Voci, Leadership Council, Dana Helene Sukenik, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Hispanic United of DuPage County, Leadership Council for Metropolitan Open Communities, Hispanic Council.

Matthew J. Piers, Jonathan A. Rothstein, Charles James Holley, Jennifer Louise Fischer, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, Theresa Ann Amato, Citizen Advocacy Center, Elmhurst, IL, James Gerard Bradtke, Jennifer Kay Soule, Soule & Bradtke, Chicago, IL, Dana Helene Sukenik, for Leopoldo Alcaraz, Debra J. Cagle, John J. Cagle, Marcella Carrillo, Rojelio Carrillo, Carl Conti, Maudie Conti, Rita Gonzalez, Oralia Herrera, Martin Hurtado, Camille Husby, Marvin Husby, Estela Ibarra, Francisco Ibarra, Salbador Ibarra, Reginaldo Ortega, David Sanchez, Jose Angel Rivera, Maria Torres, Elisa Vargas, Marcelino Vargas, Jose Villanueva, Maria Villanueva, Amparo Rojas, Jose Rojas, Jesus Rojo, San Juan Rojo, Guadalupe Solis.

Norma Jean Guess, Barry L. Moss, Daniel C. Shapiro, Moss & Bloomberg, Ltd., Bolingbrook, IL, James L. DeAno, Norton, Mancini, Argentati, Weiler & DeAno, Wheaton, IL, Daniel E. Reidy, James R. Daly, Steven Allen Wright, Jones, Day, Reavis & Pogue, Stuart Davis Gordon, Zukowski, Rogers, Flood & McArdle, Thomas R. Weiler, Norton, Mancini, Argentati, Weiler & DeAno, Roger Kevin O'Reilly, Law Offices of Roger Kevin O'Reilly, Chicago, IL, for Village of Addison, Illinois.

Norma Jean Guess, Barry L. Moss, Daniel C. Shapiro, Moss & Bloomberg, Ltd., Bolingbrook, IL, James L. DeAno, Norton, Mancini, Argentati, Weiler & DeAno, Wheaton, IL, Stuart Davis Gordon, Zukowski, Rogers, Flood & McArdle, Thomas R. Weiler, Norton, Mancini, Argentati, Weiler & DeAno, Roger Kevin O'Reilly, Law Offices of Roger Kevin O'Reilly, Chicago, IL, for Anthony Russotto.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

These consolidated lawsuits seek injunctive and other relief regarding defendant Village of Addison's attempt to create two tax increment financing districts ("TIFs") in order to redevelop neighborhoods containing high numbers of Hispanic residents. The TIFs are alleged to violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, 42 U.S.C. §§ 1981, 1982,1983 and the Equal Protection Clause. The plaintiffs include residents of the TIF districts, nonresident owners of property within the TIF districts, and three not-for-profit corporations that claim an interest in the lawsuit either because they work for the advancement of the Hispanic community or because they work against discrimination and segregation in housing. Pending before the Court is a motion for summary judgment requesting that the Court dismiss certain plaintiffs for lack of standing, redefine the plaintiff class, and dismiss the punitive damages and civil penalties claims. The Court grants the defendant's motion with regard to plaintiff Rivera's §§ 1981, 1982, and 1983 claims and plaintiffs Debra and John Cagle's §§ 1981 and 1982 claims, but denies it, without prejudice, in all other respects. The Court may revisit these aspects of the defendant's motion at the close of the plaintiffs' case.

### BACKGROUND

The following facts are drawn from the parties' Local General Rule 12 statements provided to the Court in connection with defendant's motion.[1] Tax Increment Fi-

---

1. Local General Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL GENERAL RULE (hereinafter "Local Rule") 12(M)(3). The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." *Id.* The Village of Addison's statement shall be cited as "Def.'s Facts ¶——." Similarly, Local Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. The re-

sponse of the individual plaintiffs shall be cited as "Pl.'s Facts ¶——." The response of the organizational plaintiffs shall be cited as "Org. Pl.'s Facts ¶——." Local Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; pursuant to Local Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. The individual plaintiffs' statement of additional facts shall be cited as "Pl.'s Add'l Facts ¶——." The organizational plaintiffs' statement of additional facts shall be cited as "Org. Pl.'s Add'l Facts ¶——." The Village of Addison's replies shall be cited as "Def.'s Resp. Add'l Facts ¶——." and

nancing (TIF) is a tool that aids Illinois municipalities in financing redevelopment projects. (*See* Dep. of John LaMotte, Def.'s Exhibit 10 at 69; Report of John C. Pettigrew, Def.'s Exhibit 11 at ¶ 5). The defendant formed two TIF districts in the Village of Addison in 1994. (Def.'s Facts ¶¶ 6, 10). The first, the "Army Trail/Mill Road" TIF district, was created on March 21, 1994. This district includes the Green Oaks residential neighborhood. (Def.'s Facts ¶ 6). During the spring and summer of 1994, the defendant took steps to redevelop that area by retaining a land use planning consultant, (Def.'s Facts ¶ 7), holding a conference discussing Green Oaks, (Def.'s Facts ¶ 8), and purchasing and demolishing eight four-flat buildings in Green Oaks. (Def.'s Facts ¶ 9).

While the redevelopment plan for the Army Trail/Mill Road TIF district was getting underway, the defendant was looking into the possibility of creating another TIF area that would include the Michael Lane neighborhood. (Def.'s Facts ¶ 10). This TIF district eventually was approved on October 3, 1994. (*Id.*). Three days later, the plaintiffs filed suit. (Def.'s Facts ¶ 11). They allege that the defendant's selection of TIF districts was motivated by discrimination directed toward the large numbers of Hispanics residing in the Green Oaks and Michael Lane neighborhoods. (*Id.*). The parties disagree as to whether there was ever an actual redevelopment "plan" for either neighborhood, (*see* Pl.'s Facts ¶ 12), and as to whether the village's conduct threatens further segregation of the village. (*See* Pl.'s Facts ¶¶ 47–49).

Plaintiffs Carl and Maude Conti and Camille and Marvin Husby own land in the Michael Lane neighborhood. (Def.'s Facts ¶¶ 13, 20). Both couples live in other cities, but lease the Michael Lane properties in order to finance their retirements. (Def.'s Facts ¶¶ 13, 17, 20, 26). Although the Contis admit that they have yet to suffer any financial loss due to the defendant's conduct, (*See* Pl.'s Facts ¶ 16), they fear the loss of their property as a result of the TIF. (*See* Pl.'s Facts ¶¶ 17–18). The Husbys have been unwilling to secure new leases from their current tenants because they fear they will be liable for any losses the tenants incur should the defendant destroy their building. (Def.'s Facts ¶ 23). In addition, Marvin Husby testified that he believes the TIF is responsible for vacancies between tenants, (Pl.'s Facts ¶ 24; Dep. of Marvin Husby, Pl.'s Exhibit 7 at 40–41), that it has frozen the market value of his property, (Pl.'s Facts ¶ 26), and that he may be the target of retaliation fueled by his opposition to past and present Village proceedings. (*See* Pl.'s Facts ¶ 26; Dep. of Marvin Husby, Def.'s Exhibit 26 at 23–29). Like the Contis, the Husbys fear the loss of their property as a result of the TIF. (*See* Pl.'s Facts ¶¶ 25–26).

Plaintiff Jose Angel Rivera is a Hispanic resident of Addison who lives just outside the Michael Lane TIF. (Def.'s Facts ¶ 28). He claims emotional injury from the TIF's creation because he believes the Hispanic neighborhood was "a targeted area." (Def.'s Facts ¶ 31). In addition, he claims the TIF threatens the personal and professional benefits that he enjoys as part of living in an integrated community. (Pl.'s Facts ¶ 34; Rivera Aff., Pl.'s Exhibit 10).

Plaintiffs Debra and John Cagle are white residents of Green Oaks. (Pl.'s Add'l Facts ¶ 5). They have lived in the neighborhood for ten years. (*Id.*) The Cagles were forced to change buildings when the defendants demolished their residence as part of the conduct at issue in this case. (*Id.* at ¶¶ 4–5). One of the reasons the Cagles chose to remain in the Green Oaks neighborhood is to continue enjoying the personal and professional benefits of an integrated community.

---

"Def.'s Resp. Org. Add'l Facts ¶ ——." All properly supported material facts set forth in either party's statement (*i.e.*, Def.'s Facts, Pl.'s Add'l Facts or Org. Pl.'s Add'l Facts) are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v.*

*McGinnis,* 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

(Cagle Affs., Pl.'s Exhibit 16). They claim that the TIF threatens imminent loss of those benefits.

Plaintiffs Hispanics United of DuPage County, Hispanic Council, and the Leadership Council for Metropolitan Open Communities ("the Leadership Council") (collectively, the "Organizational Plaintiffs") claim that the defendant's conduct forced them to divert resources from their ordinary activities in order to investigate and oppose the TIFs. (Def.'s Facts ¶¶ 35, 38, 41). Hispanics United's goal is "to promote educational, spiritual, social, political, economic and cultural progress of all people, and particularly the Hispanic community of DuPage County." (Org. Pl.'s Facts ¶ 37). Its normal activities include organizing youth sporting events, neighborhood clean-ups, community celebrations, homework assistance, and educational programs. (Id.). Rita Gonzalez, the President of Hispanics United, has met with many Hispanic people living in Addison in order to educate them about their housing rights and responsibilities. (Org. Pl.'s Facts ¶ 36).

In connection with the TIF districts, Gonzalez has "worked with individuals ... to help them cope with the uncertainty surrounding the future of their homes and the fear of being displaced," (Id.; Gonzalez Aff., Org. Pl.'s Exhibit A at ¶¶ 7, 10, 24), and has "negotiated with representatives of the Village concerning the fate of the individuals who were dislocated, or who were in danger of being dislocated in the future, as a result of the Defendant's actions." (Id.; Pelayo Dep., Org. Pl.'s Exhibit B at 5–27, 69–70, 131–39; Gonzalez Aff., Org. Pl.'s Exhibit A at ¶¶ 8–9, 20; Letter from Joseph Block to Jane Taylor, Org. Pl.'s Exhibit C at 1). Because Hispanics United has many members who reside in the TIF districts and because it is involved in the Addison community as a whole, it claims direct injury from the defendant's conduct and believes it has had "no choice but to become involved in this matter." (Org. Pl.'s Facts ¶ 37; Gonzalez Aff., Org. Pl.'s Exhibit A at ¶¶ 7–25).

Hispanic Council is an organization that represents Hispanic individuals in DuPage, Kane and Cook Counties and seeks to "eliminate prejudice, discrimination, and community deterioration." (Org. Pl.'s Facts ¶ 40). The Council responded to the TIF districts by "initiat[ing] a victim localization project to determine who had been dislocated, and, if possible, to assist those people in finding suitable replacement housing." (Org. Pl.'s Facts ¶ 39). Luis Pelayo, the organization's President, tracked the TIF proposals in the newspapers, studied legal texts and wrote editorials about the project. (Pelayo Aff., Org. Pl.'s Exhibit E at ¶¶ 7–8). He also met with Village representatives to discuss relocation assistance for those who would be dislocated by the redevelopment plan. (Id.). Like Hispanics United, Hispanic Council has many members who reside in Addison and in the two TIF districts, (Org. Pl.'s Facts ¶ 40), and Hispanic Council claims direct injury as a consequence of the defendant's conduct. (Id.).

The Leadership Council's goal is "to replace discrimination and segregation with an open housing market, an essential component of a thriving regional economy." (Org. Pl.'s Facts ¶ 43). Hispanics United requested the assistance and expertise of the Leadership Council in evaluating the TIF districts and their impact on fair housing. (Id.; see also Gonzalez Aff., Org. Pl.'s Exhibit A, at ¶¶ 17–18; Pennick Aff., Org. Pl.'s Exhibit G, at ¶¶ 5–8). Although the Leadership Council has no members who reside in the TIF districts, it worked with Hispanics United and Hispanic Council to negotiate with the defendant and assist potentially dislocated individuals. (Org. Pl.'s Facts ¶ 42). Alleging that the defendant's conduct infringed upon its mission of open housing and its ability to provide housing counseling, referrals and industry initiative programs, the Leadership Council claims it was directly injured by the defendant. (Org. Pl.'s Facts ¶ 43; Pennick Aff., Org. Pl.'s Exhibit G, at ¶¶ 4, 17).

The defendant moves for summary judgment, arguing that the Contis, the Husbys, the Cagles, Rivera and the organizational plaintiffs lack standing. Accordingly, the defendant requests that the plaintiff class be redefined to exclude plaintiffs who are not residents of the TIF districts or who otherwise lack standing. Finally, the defendant asks the Court to dismiss the plaintiffs' re-

quest for punitive damages and civil penalties.

## ANALYSIS

### I. Summary Judgment Standards

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987), and draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.1988).

In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. at 2513–14. Finally, we note that mere conclusory assertions, unsupported by specific facts, made in affidavits opposing a motion for summary judgment, are not sufficient to defeat the motion. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of an affidavit. "); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact. "); *see also Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment. ").

### II. Standing

■ Federal courts are limited by Article III, § 2 of the Constitution to deciding "Cases" or "Controversies." *Arizonans for Official English v. Arizona*, —— U.S. ——, ——, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997). A component of this requirement is that parties before federal courts must have standing to sue. *Id.* Standing has been defined by the Supreme Court to include three elements. First, the plaintiff must suffer from an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The Supreme Court recently elaborated on this element in the *Arizonans* case:

> To qualify as a party with standing to litigate, a person must show, first and foremost, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." An interest shared generally with the public at large in the proper application of the Constitution and laws will not do.... [S]tanding to sue[ ] demands that the litigant possess "a direct stake in the outcome."

—— U.S. at ——, 117 S.Ct. at 1067 (citations omitted). Second, the plaintiff must demonstrate causation between the defendant's actions and the injury complained of. *Defenders*, 504 U.S. at 560, 112 S.Ct. at 2136. Finally, the injury must be redressable by a favorable court decision. *Id.* at 561, 112 S.Ct. at 2136–37. These three conditions ensure that "legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

**1326**

For most claims, standing involves a prudential doctrine as well. The prudential doctrine requires that " 'the plaintiff generally ... assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interest of third parties.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). It also prohibits courts from "adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances, pervasively shared and most appropriately addressed in the representative branches.' " [2] *Id.* at 475, 102 S.Ct. at 760 (quoting *Warth*, 422 U.S. at 499–500, 95 S.Ct. at 2205–06). In the present case, plaintiffs' §§ 1981, 1982 and 1983 claims are subject to these prudential restraints. *See Warth*, 422 U.S. at 514, 95 S.Ct. at 2213. However, standing under the Fair Housing Act is "as [broad] as is permitted by Article III of the Constitution." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 108–09, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972). To that end, federal courts "lack the authority to create prudential barriers to standing in suits" brought under the Fair Housing Act. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120–21, 71 L.Ed.2d 214 (1982). Therefore, the only requirements for standing to sue under the Fair Housing Act are the three elements imposed by Article III. *Id.*

### A. Absentee Landlords

The defendant first argues that the absentee landlords, the Husbys and the Contis, who own property in the TIF districts but do not reside there, lack standing. Standing is allegedly absent in the landlords' case because they have demonstrated no "injury in fact": the defendant maintains that the Husbys and Contis have shown no financial harm to date, cannot show that such harm is imminent, and assert claims of emotional harm evidenced by only conclusory statements. The Court acknowledges the fact that the landlords have apparently not suffered any financial harm to date; however, we find that the threat of such harm is sufficiently imminent to confer standing. Because injury in fact is conferred through the imminent loss of the use of their property, the Court finds it unnecessary to weigh the landlords' subjective evidence of emotional harm.[3]

In *Sierra Club v. Marita*, 46 F.3d 606, 611 (1995), the Seventh Circuit determined that imminence is established once a plan "has passed administrative review ... Unless a plaintiff's purported interest in the matter is wholly speculative, waiting any longer to address that injury makes little sense." The court permitted the Sierra Club to challenge forest management plans adopted, but not yet implemented, by the United States Forest Service. Rejecting the Service's contention that injury was not imminent because the plans "are programmatic and do not themselves implement anything or specify that any particular activity happen," the court held the Sierra Club did not have to wait until the Service developed site-specific projects to file suit. *Id.* at 611–12. Because the objection was to the overall plan, its mere adoption supplied the requisite imminence. *Id.* at 614.

Imminence is likewise found in this case. As in *Marita*, the allegedly harmful plans

---

**2.** There is no defined list of prudential concerns. Some courts have also included a "zone of interest" test requiring that the plaintiff's interest, "regardless of its nature in the absolute, at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1924 n. 19, 48 L.Ed.2d 450 (1976) (quoting *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

**3.** *See United States v. Balistrieri*, 981 F.2d 916, 932 (7th Cir.1993) (upheld award for emotional distress despite the lack of detailed description of that distress). *But see Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981) (political discharge case saying that conclusory statements about emotional harm are not sufficient to establish damages for emotional distress).

have passed administrative review: defendants have adopted TIFs for both the Green Oaks and Michael Lane neighborhoods. In Green Oaks, development has progressed even further, in the form of retaining a land use planning consultant, discussing the Green Oaks TIF at meetings, and, most importantly, the demolition of eight four-flat buildings. Residents of Green Oaks have already been displaced as a result. Although both the Contis and Husbys live in Michael Lane, where less activity has accompanied the TIF's passage, their fear of losing the buildings they own is not "wholly speculative," given the turn of events in Green Oaks. Moreover, under *Marita,* these landlords are permitted to challenge the Michael Lane TIP as a whole before it is implemented, or, indeed, even set out in detail. For their part, the Husbys have testified to imminent financial harm that reaches beyond physical property loss—they believe that the TIP has resulted in vacancies between tenants (and therefore lost rent) and frozen their property values. We find these facts sufficient to establish the threat of imminent financial harm caused by the TIPs. Furthermore, we agree that this imminent harm is redressable by a favorable court decision, in the form of damages and/or a permanent injunction preventing redevelopment. The Contis and Husbys consequently satisfy Article III's requirements, and can maintain standing under the Fair Housing Act.

The landlords' situation stands in sharp contrast to the plaintiffs in *Lujan v. Defenders of Wildlife.* The plaintiffs brought suit to protect endangered species that they hoped someday to study, but whose extinction was threatened by the defendant's construction plans. 504 U.S. at 562–63, 112 S.Ct. at 2137–38. There was no *concrete* interest in that case because the plaintiffs may or may not have eventually decided to study the endangered species. *Id.* at 564, 112 S.Ct. at 2138; *see also Stein v. Montgomery,* 41 F.3d 1156 (7th Cir.1994) (plaintiff attorney was not imminently threatened by a courthouse sign with which he disagreed simply because he might represent someone in that courthouse someday). Were the Contis and Husbys simply hoping to purchase property in the TIF areas, they might have similarly failed the Article III test. But their ownership is current, not speculative, and, as such, constitutes a concrete interest imminently threatened by the TIFs. The Seventh Circuit in *Marita* elaborated on this crucial distinction: In *Defenders,*

> [the] plaintiffs' interests were not in imminent danger because "the acts necessary to make the injury happen [to those interests] [were] at least partly within the plaintiffs['] own control. In other words, the *Defenders* Court did not perceive the plaintiffs' interests as necessarily materializing, a situation far different from the present case where it is only a matter of time before the management plans are implemented and affect the Sierra Club's interests.

46 F.3d at 613 (citations omitted). In this case as well the plaintiff landlords lack control over the conduct causing the injury; the defendant alone determines the scope and implementation of the TIFs. As in *Marita,* it is only a matter of time before the TIF plans translate into action.

■ Next, the landlords must overcome the application of the prudential doctrine to their §§ 1981, 1982, and 1983 claims. While the doctrine does not apply to plaintiffs under the Fair Housing Act, it has been used to dismiss plaintiffs under §§ 1981, 1982 and 1983 of the Civil Rights Acts. *See Warth,* 422 U.S. 490, 95 S.Ct. 2197. The defendant argues that, even if the landlords show Article III standing, it is the Hispanic residents of the TIF areas who are the purported victims of illegal discrimination under these statutes and it is the residents alone who are properly before the Court. When third parties are suing for illegal action taken against others, "the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500, 95 S.Ct. at 2206.

■ Under normal circumstances, only the direct victims of discrimination would be appropriate plaintiffs, because they are the people Congress meant to protect. However, cases that involve discriminatory housing

or property actions often interfere with the contractual rights of home owners seeking to rent or sell to minorities. In such cases, a home owner is often "the only effective adversary." *Barrows v. Jackson*, 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1953). To restrict the standing of such owners would be "quite inconsistent with the broad and sweeping nature of the protection meant to be afforded [under § 1982]." *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969); *see also Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344 (7th Cir.1970). Similarly, under § 1981, plaintiff homeowners and developers have standing when their contractual relationships with minorities are punished or disrupted by a defendant's discriminatory conduct. *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 17 (1st Cir.1979), *vacated in part on other grounds*, 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981). Finally, § 1983 plaintiffs have standing when their contractual, social or commercial relationships with minorities are injured by official discrimination. *Scott v. Greenville County*, 716 F.2d 1409, 1415 (4th Cir.1983).

█ The absentee landlords have ongoing contractual relationships with their Hispanic tenants. And, as discussed above, these relationships face imminent disruption as the result of the defendant's allegedly discriminatory misconduct in connection with the TIFs. Accordingly, the Court holds that the landlords are appropriate plaintiffs under §§ 1981, 1982 and 1983, as well as under the Fair Housing Act.

### B. Jose Angel Rivera

Rivera's asserted injury is the loss of social and professional benefits gained from an integrated community. It is conceded that such an injury, when supported by sufficient evidence, meets the Article III requirements and therefore confers standing under the Fair Housing Act. *See Gladstone*, 441 U.S. at 112, 99 S.Ct. at 1614; *Trafficante*, 409 U.S. at 210, 93 S.Ct. at 367. However, the defendant contends that Rivera cannot show injury-in-fact because there is not enough evidence to show that the redevelopment plans will lead to further segregation in the Village.

Without such evidence, it is argued, the threat to Rivera's enjoyment of an integrated Addison is merely speculative.

Defendant rests its argument primarily upon the private plaintiffs' and United States' Response to Defendant's Supplemental Written Interrogatories. (*See* Defendant's Exhibit 17 at 6). When asked if "redevelopment of the Green Oaks and Michael Lane neighborhoods will increase racial and/or ethnic segregation within the Village of Addison," (*id.*), the plaintiffs responded that they "do not claim that any redevelopment of these neighborhoods will necessarily increase or decrease racial and/or ethnic segregation within the Village of Addison." (*Id.*) While the defendant interprets this statement as an admission that further segregation of the city is merely speculative, the Court declines to tie the plaintiffs' hands with this statement in light of their explanation and contrary evidence in the record. In their Response memorandum, plaintiffs acknowledged that their interrogatory response was "an accurate statement but hardly an admission: a redevelopment that did not displace the current residents would obviously have different effects than a redevelopment that displaced all of the residents and changed the use of the property." (Response of Individual Plaintiffs at 9).

█ More importantly, the plaintiffs have submitted two major pieces of evidence that support their claims of a Village-wide increase in segregation. First, the expert opinion of Marta Tienda predicts a significant decrease in the number of Hispanics in Addison if the census block groups containing the TIF residents were displaced because (1) the TIF areas include the largest Hispanic populations in the city and (2) Addison has a very low rate of apartment vacancies. (*See* Tienda Report, Defendant's Exhibit 3 at pp. 1, 2, 6, Table 3). Second, plaintiffs point to a statement made by Joe Block, the Village Manager, which indicates that the TIF projects could reduce Addison's population by 3,000 people. (Plaintiffs' Exhibit 12). This number corresponds to the number of predominantly Hispanic persons living in TIF districts. (Id.) Despite a somewhat cryptic interrogatory response, the evidence as a

whole indicates a triable issue as to whether the defendant's TIF plans are an imminent threat to the ethnic integration of Addison. As part of that community, Rivera can claim an injury in fact and proceed as a plaintiff under the Fair Housing Act.[4]

### C. The Cagles

The defendant concedes that the Cagles, the white plaintiffs living in Green Oaks who have been displaced by TIF activities, have standing to sue under the Fair Housing Act. It is contended, however, that the application of the prudential doctrine under §§ 1981, 1982 and 1983 bars the Cagles' standing because they are not Hispanic and therefore are not the direct victims of discrimination. While this is correct with respect to the Cagles' §§ 1981 and 1982 claims, it is not true for the Cagles' claim under § 1983.

The Cagles allege three injuries resulting from the defendant's alleged race discrimination against their neighbors. First, they have already lost a residence to the defendant's redevelopment scheme. Second, they face an imminent threat of being displaced again as redevelopment activities continue. Third, the Cagles contend that the TIF threatens to deprive them of associational rights to the social and professional benefits of living in an integrated neighborhood. While these injuries cannot confer standing under §§ 1981 and 1982, they do support an action under § 1983.

■ To maintain standing under 42 U.S.C. §§ 1981 and 1982, a plaintiff must allege injury to "a contractual or other relationship" protected by those statutes. *Warth*, 422 U.S. at 514 n. 22, 95 S.Ct. at 2213 n. 22. The Cagles do not allege that either the loss of their first residence or imminent displacement from their second home did or will adversely affect any contractual relationship. However, to the extent that they face impending displacement from the Green Oaks community, which is currently integrated, or that the displacement of their neigh-

bors threatens to rob the neighborhood of its integrated nature, the Cagles do allege that an "other relationship"—one with their Hispanic neighbors—is in imminent danger as a result of the TIF. Viewed in this light, the Cagles' first two injuries are relational injuries, but are indistinguishable from (and may be seen as components of) the Cagles' third injury, the loss of associational rights to the social and professional benefits of living in an integrated society. The question is therefore whether this kind of relational injury is protected by §§ 1981 and 1982. In *Warth v. Seldin*, the Supreme Court answered "no," holding that the benefits of living in a racially and ethnically integrated community did not amount to a protected contractual or other relationship under §§ 1981 and 1982. 422 U.S. at 514 n. 22, 95 S.Ct. at 2213 n. 22. The Court also dismissed the plaintiffs' § 1983 claim because they did not allege a denial of their constitutional rights, as required for standing under that statute. *Id.* at 514, 95 S.Ct. at 2213.

■ Although the Cagles' relational injury is not cognizable under §§ 1981 and 1982, it nevertheless confers standing under § 1983. This is because the Cagles meet the statute's requirement (which the plaintiffs in *Warth* did not satisfy) of alleging the denial of their own constitutional rights. The right at issue for the Cagles is the Equal Protection Clause's guarantee that the government will not punish its citizens for their associating with persons from minority groups. *See Des Vergnes*, 601 F.2d at 17 (finding standing under § 1983 because "a State must not discriminate against a person because of his race or the race of his companions.... Therefore a State may not punish a nonwhite for having social contacts with a black."). This right was confirmed in *Scott v. Greenville County*, where the Fourth Circuit held that a real estate developer suffered a § 1983 injury when he was denied a building permit to develop multifamily housing complexes that would house largely minority tenants. The court rested its holding in part on

---

**4.** Plaintiffs do not assert, and apparently concede, that plaintiff Rivera has no standing to bring any claims under 42 U.S.C. §§ 1981–1983 because of the prudential aspect of the standing doctrine. Because plaintiff Rivera alleges no

contractual or social relationship with the class members, the Court hereby grants the defendant summary judgment as to Rivera's claims under §§ 1981, 1982 and 1983.

the fact that Scott was a developer, who "is a proper plaintiff to assert the rights of prospective minority tenants." 716 F.2d at 1415. But it was more important that the defendants had "singled out Scott for disadvantageous treatment because of his willingness to house minority tenants"; as a result, "Scott in his own stead suffered injury to his right to be free from official discrimination." *Id.* Here, the Cagles likewise face the imminent harm of being "singled out" based on alleged racial considerations—for their willingness to live in an integrated community and associate with their neighbors of color. The official acts threatening imminent harm to these rights grant the Cagles standing to bring a § 1983 equal protection-based claim in their own right.

In sum, the Cagles have no standing under §§ 1981 or 1982 because they lack the requisite contractual relationship that those statutes protect. But they can maintain standing under § 1983, based on an alleged denial of their own constitutional rights.

### D.  *Organizational Plaintiffs*

Finally, the defendant argues that the organizational plaintiffs, Hispanics United, Hispanic Council, and the Leadership Council, can prove no injuries independent of their decisions to challenge defendant's conduct. The Court disagrees.

The standing of organizational plaintiffs is based upon an increase, due to the defendant's purportedly illegal conduct, in "the resources the group must devote to programs independent of its suit challenging the action." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990). In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court specifically held that an organization committed to fair housing had standing to challenge a defendant's racial "steering" practices, through which minority applicants for housing were routinely directed toward certain areas. The organization had sent "testers" to apply for housing with the defendant. After its testers were steered toward certain units, the organization filed suit claiming the defendant frustrated its goals and forced it to spend money investigating and opposing the defendant's conduct. *Id.* at 369, 102 S.Ct. at 1119. The court upheld the organization's standing, explaining:

If, as broadly alleged, petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract interests.

*Id.* at 379, 102 S.Ct. at 1124. Like the open housing organization in *Havens,* all three organizations in this action have expended time investigating and opposing the TIF districts created by the Village of Addison. Furthermore, as advocates of open housing (the Leadership Council) and as advocates for the advancement, equality, education and celebration of the Hispanic community (Hispanics United and Hispanic Council), the organizational plaintiffs correctly view the alleged targeting of Hispanic neighborhoods for redevelopment and dislocation as a frustration of their goals.

In a futile effort to overcome the *Havens* holding, the defendant cites to *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). That case is clearly distinguishable. In *Diamond*, a pediatrician intervened as a defendant when four other physicians challenged an abortion law which, by increasing abortion regulation, directly affected their practices. *Id.* at 57, 106 S.Ct. at 1700–01. The pediatrician's intervention was based upon his conscientious objection to abortion, his status as a physician and his status as the parent of a minor daughter. *Id.* at 58, 106 S.Ct. at 1701. When the plaintiffs won and were awarded attorney's fees against the defendants jointly and severally, the defendant pediatrician appealed. In holding that he had no standing on his own, the Court pointed out that he was not endangered by the invalidation of the law, since he never had a right to have it enforced. *Id.* at 64, 106 S.Ct. at 1704. Furthermore, his

claim that the award of attorney's fees gave him the requisite injury in fact was rejected as an injury with no "nexus to the substantive character of the statute or regulation at issue." *Id.* at 70, 106 S.Ct. at 1707.

The Court hardly needs to point out the differences between the *Diamond* intervenor and the present organizational plaintiffs. In this case, the organizations are challenging municipal actions which have direct impact on their activities, not simply attempting to influence the ethical standards of society. Moreover, they claim damages based upon time spent reviewing conduct that was later challenged legally, not a law they had no right to enforce. They also have been involved as an integral part of the opposition to the TIFs from the beginning, in contrast to the *Diamond* intervenor who jumped into an already filed lawsuit and then claimed injury in fact based upon the award levied against him. Although the *Diamond* case may share some theoretical issues with the present case, the Court finds *Havens* to be more directly on point and to dictate the continued standing of the organizational plaintiffs.

### III. Redefining the Plaintiff Class

Because defendant's motion to redefine the plaintiff class was predicated on its motion for summary judgment against certain plaintiffs, the issue is moot at this point based on our decision to retain all the plaintiffs in the class. We may, however, revisit the issue at the close of plaintiffs' case.

### IV. Punitive Damages

In their prayer for relief, the private plaintiffs request punitive damages for the defendant's alleged civil rights violations. In addition, the United States requests the Court to impose civil penalty fines under 42 U.S.C. § 3614(a). The defendant contests both kinds of relief. With respect to the first, the defendant argues that municipalities such as the Village of Addison are immune from punitive damages. As for the second, the defendant acknowledges that there is no established immunity to civil penalties, but claims that the underlying policy for imposing them is indistinguishable from the policy supporting punitive damages. As such, the defendant requests the Court to find it immune to this form of relief as well.

■ The Supreme Court held that municipalities are immune from punitive damages under § 1983 in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The defendant argues that the *Fact Concerts* immunity should be extended not only to §§ 1981 and 1982, but also to the Fair Housing Act. This Court and the Seventh Circuit agree that, generally speaking, the civil rights laws do not allow for punitive damages against municipalities. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1270 (7th Cir.1984) (§ 1981); *Wade v. Cicero*, 571 F.Supp. 157, 159 (N.D.Ill.1983) (1982); *United States General, Inc. v. City of Joliet*, No. 75-C-4002 (N.D.Ill. Feb.10, 1984) (LEXIS, Genfed library, Dist. file) (Fair Housing Act). Most notably, the Seventh Circuit stated in *Bell* that "the goals underlying punitive damages—retribution and deterrence— would not be significantly advanced by awarding punitive damages in Section 1983 actions against a municipality [, a principle that] ... is equally true for actions brought under other Sections of the civil rights laws." [5] 746 F.2d at 1270 (citations omitted).

The Court must acknowledge, however, that *Fact Concerts* itself left a narrow exception to municipal immunity in Footnote 29:

It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights.

---

**5.** Although plaintiffs argue that the policy and history underlying the Fair Housing Act warrant different treatment on this issue, the Court is not persuaded. A policy through which "retribution should be visited upon the shoulders of blameless or unknowing taxpayers," *Fact Concerts*, 453 U.S. at 267, 101 S.Ct. at 2759–60 (footnote omitted), is unsettling whether it is applied under § 1983 or under the Fair Housing Act. Furthermore, the legislative history of the FHA is ambig-

uously silent on the point of municipal immunity from punitive damages. Plaintiffs argue that the Act's silence indicates that no immunity was contemplated, (United States' Resp. Brief at 11–13), while defendant argues that the Act was silent because legislators assumed such immunity already existed. (Def.'s Reply Brief at 6–7). The Court prefers to rest its decision on the pertinent caselaw and declines to resolve this dispute over the interpretation of legislative history.

Nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

453 U.S. at 267 n. 29, 101 S.Ct. at 2760 n. 29. Plaintiffs argue that such a situation is not so unlikely in Fair Housing Act violations, because land-use decisions are often the result of the discriminatory wishes of constituents. *See, e.g., Dailey v. City of Lawton, Okl.,* 425 F.2d 1037, 1038 (10th Cir.1970); *Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065 (4th Cir.1982); *United States v. Borough of Audubon, N.J.,* 797 F.Supp. 353, 361 (D.N.J. 1991), *aff'd,* 968 F.2d 14 (3d Cir.1992). But, as the plaintiffs acknowledge, none of these cases involves punitive damage awards. Moreover, the Footnote 29 exception has never been successfully invoked under the Fair Housing Act or any other civil rights statute.

The First Circuit has, however, articulated some standards for deciding whether to apply *Fact Concerts' Footnote* 29 exception. *See Heritage Homes v. Seekonk Water Dist.,* 670 F.2d 1, 2 (1st Cir.1982). The *Heritage* court suggests that the determining factor is the extent and nature of taxpayer participation in reprehensible municipal conduct, not the statute under which the plaintiff claims. *Id.* Before a court can award punitive damages against a municipality, the plaintiff must prove "widespread and knowledgeable participation by taxpayers" in the municipality's "outrageous abuse of constitutional rights." *Id.* Absent such a showing, the court would be punishing "blameless or unknowing taxpayers" for the sins of their guilty fellow citizens. *Id.* Applying this standard to the facts before it, the court found that although there was "overwhelming evidence" of discriminatory motive, manifested by "blatantly racial discussions" among the citizens attending the meeting that spurred the discriminatory conduct, the high standard for imposing punitive damages was not met. *Id.* Only a minute percentage of taxpayers attended that meeting, and the court lacked crucial information about the knowledge and intent of the absent taxpayers. *Id.* The court also found that deterrence would hardly be served by permitting a small group of guilty taxpayers to share hefty fines with the large number of innocent taxpayers. *Id.*

We lack the same important information about the Village inhabitants' knowledge and participation in the defendant's decision to adopt the TIPs. Although the plaintiffs claim that the evidence will show that "a significant part of the defendant's motivation was to cater to the vocal concerns of bigoted Village residents," (Response of Individual Plaintiffs at 14), the record does not currently reflect this. The United States apparently concedes as much, requesting the Court to permit it to develop evidence of residents' knowledge and participation at trial. (United States' Response at 13). We grant this request, and decline to foreclose the possibility of awarding punitive damages should the plaintiffs meet their stiff burden of proving the residents' widespread knowledge and participation in perpetrating an outrageous abuse of constitutional rights. Nevertheless, we caution that such damages might adversely affect the plaintiffs themselves, who also share tax burdens and may benefit from Village services that could wane if a large award bankrupts the treasury.

With regard to civil penalties, the defendant has a much more difficult case. As the United States points out, civil penalties have been awarded against municipalities under the Fair Housing Act. In *Smith & Lee Associates, Inc. v. City of Taylor, Mich.,* 13 F.3d 920, 932 (6th Cir.1993), the court interpreted the Act as giving courts the ability to impose civil penalties "to vindicate the public interest." (citations omitted). Although the court ultimately found, on appeal after remand, that civil penalties were not warranted in that particular case because the facts did not reveal intentional discrimination, the court emphasized that, in cases of intentional discrimination, civil penalties against municipalities are "especially appropriate." *Smith & Lee Associates, Inc. v. City of Taylor, Mich.,* 102 F.3d 781, 797–98 (6th Cir.1996); *see also United States v. Borough of Audubon, N.J.,* 797 F.Supp. 353 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3d Cir.1992) (awarding $10,000 civil penalty against municipal defendant). While civil penalties and punitive damages are similar, there appears to be a legal distinction emerg-

ing between them with regard to municipal immunity under the Fair Housing Act. *See Balistrieri*, 981 F.2d at 936 ("Punitive damages are paid to [private] plaintiffs; civil penalties are paid to the United States. "). Although the Court is sympathetic to defendant's argument that the policies underlying punitive damages and civil penalties may seem almost indistinguishable, it declines to stake out new territory in this regard. Instead, the Court will hear all the plaintiffs' evidence before reconsidering the claims for punitive damages and civil penalties.

## CONCLUSION

The Court dismisses the §§ 1981 and 1982 claims of the Cagles and Rivera because they have no contractual ties to the Hispanic TIF residents. In addition, the Court dismisses Rivera's § 1983 claim because he did not allege the requisite social relationship giving rise to a constitutional violation under the Equal Protection Clause, or claim any other direct constitutional violation. All other aspects of defendant's motion are denied without prejudice and may be revisited at the close of plaintiffs' case.